Andre JACKSON, Petitioner,

v.

Carl ANDERSON, Warden Respondent.

No. 1:96CV794.

United States District Court,
N.D. Ohio,
Eastern Division.

May 9, 2001.

(Dkt.# 14) ("Petition") of Andre Jackson ("Jackson"). Jackson alleges 48 separate grounds for relief in the Petition.

Also before the Court are Jackson's Memorandum in Support of the Application (Dkt.# 15) ("Memorandum"), Respondent's Return of Writ (Dkt.# 34) ("ROW"), and Jackson's Traverse (Dkt.# 45).

For the reasons which follow, the Petition is **DENIED**.

## I. INTRODUCTION

In 1985, Jackson was convicted by a jury in the Common Pleas Court of Cuyahoga County, Ohio of aggravated murder and aggravated robbery. The Ohio Court of Appeals for the Eighth District later stated that "[t]he record demonstrates Jackson committed a brutal and senseless murder of an elderly woman in his effort to steal a cash register and its contents." *State v. Jackson,* 1989 WL 117432 (Ohio App. 8 Dist.) * 1. The Court of Appeals found that the evidence supported the jury's finding that Jackson was the principal offender in the crime, and that the sole aggravating circumstance of the crime, the commission of the aggravated robbery, outweighed the mitigating factors presented by Jackson. *See id.*

## II. FACTUAL BACKGROUND

The Supreme Court of Ohio rendered the following binding factual findings with respect to this case:

On June 25, 1987, at a laundromat in Euclid, Ohio, Emily Zak was found dead, her head stuffed in a toilet. Following an intense investigation, police apprehended the defendant, Andre L. Jackson, on September 4, 1987, and subsequently charged him with aggravated murder with a death specification, and with aggravated robbery.

Nathan A. Ray, Burdon & Merlitti, Patricia A. Milhoff, Akron, OH, for petitioner.

Jon W. Oebker, Office of the Assistant Attorney General, Cleveland, OH, for respondent.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the Petition for Writ of Habeas Corpus

Emily Zak, age seventy-five, had worked for the laundromat owner, James Horton, since 1983. Zak, a meticulous attendant, started each day with a $100 change fund in the cash register, and pinned the register keys to her smock. The laundromat had a variety of vending machines, but patrons had to write down their names and phone numbers to get a refund for money lost in faulty machines. Horton, after daily checking the blue note pad kept for that purpose, would call any patron claiming a refund.

Although Zak went to the nearby Convenient Food Mart on June 25 at 9:30 a.m. for her usual morning coffee, she did not go back at 11:45 a.m., as she normally would have done. According to one customer who left the laundromat that morning around 11:00 a.m., or possibly even 11:30, Zak was still fine. Another customer went into the laundromat around 11:30 a.m. to use the copy machine. He did not see anyone there and left after three or four minutes.

Around 12:30 p.m., a bystander told a customer that the laundromat attendant was in the bathroom with her head in the toilet. The customer went to the Convenient store and asked the Convenient store owner to investigate. The owner went to the laundromat, searched for Zak, entered the toilet stall, found her body, and notified the authorities.

Police, responding to a 12:50 p.m. call, found Zak dead. She was on her knees, her face and head pushed into the toilet up to her shoulders. Zak's blouse, smock, and undergarments were in disarray. Her back showed a patterned bruise. A purse, makeup kit, and eyeglass case were on the floor. Police secured the scene, took extensive photographs, dusted for finger-prints, and searched for clues and witnesses. They found that the cash register and register keys were missing.

Though police could not find the missing register, they did find the blue note pad used to record requests for refunds. The top sheet had a note which said:

"Pete Johnson

"681–4957

"is ac"

Horton had checked on June 24 and found no note then; hence, he concluded this note was written on June 25. Police tried to locate "Pete Johnson." Horton identified the cursive writing "is ac" as written by Emily Zak. At trial, an expert document examiner testified that the words "Pete Johnson" and "681–4957" were written by Jackson.

Zak died as a result of "crushing impact to the neck and trunk with multiple fractures." She had a broken neck, skull fracture, fractured esophagus, and the third through tenth ribs were fractured. The coroner estimated that she had received at least four head impacts, one very severe blow or crushing impact to the neck, three blows to the trunk, and another two or three to the extremities. Her neck injuries were consistent with someone stepping on her neck, and patterned bruises on her body were consistent with a shoe print. Other injuries were of the type produced by a blunt object, such as a fist.

Police continued investigating but because of the laundromat's cleanliness, they found few prints. On June 29, a fingerprint specialist found a latent palm print and left index fingerprint very high and forward on the toilet stall's left wall. At trial, two expert witnesses identified the prints as Jackson's.

On July 21, police found the register in a heavily wooded area, about one-fourth of a mile from the laundromat and two hundred twenty paces from

where Jackson lived. Next to the register, police found two large plastic bags. One bag was similar to those the laundromat sold. The other bag was similar to those used by the maintenance man at the apartment complex where Jackson lived.

On the day police found the register, they coincidentally arrested Jackson for an unrelated offense of receiving stolen property. At Jackson's request, Euclid detective Ted Schafer helped Jackson secure a reduced bail bond. Jackson told Schafer, who was investigating Zak's murder, that visitors to Jackson's apartment had discussed the Zak murder. One visitor had said that the murderer had to get rid of his shoes because the police had footprints, and that the victim had a snotty attitude. Jackson promised to call Schafer if he learned anything else about Zak's murder.

In late August, Schafer was attempting to locate a possible witness named "Andre." When Jackson was pointed out to a police officer as "Andre," that officer told Jackson to contact detectives investigating Zak's homicide. Jackson called Schafer the next day, and they met.

When Schafer interviewed Jackson on September 4, Jackson was not a suspect, but Schafer did drive Jackson to the police station to obtain a written statement. At the station, Schafer realized that Jackson was the missing "Andre." Police Captain Patrick Newkirk, in charge of Zak's murder investigation, joined Schafer in interviewing Jackson.

During this interview, Jackson claimed to have been in the laundromat only once. Jackson asserted that everyone knew who killed Zak, but no one would say. Jackson also claimed that he and several friends had been playing basketball, heard about the register's

location, ran to the woods, and searched the register for money but found only change. When asked, Jackson said his fingerprints would be found on the cash register and on the nearby plastic bags. In fact, police found no prints on the register or the bags. After this admission, Newkirk ordered Jackson's arrest for tampering with evidence because Jackson knew so much about the crime, e.g., the amount of money taken, exactly where the register was found, and the presence of plastic bags.

After Jackson's arrest, a detective checked Jackson's palm print and fingerprint against the latent prints from the toilet stall. He found them to be identical. Jackson, while in jail, worried about his mother's health, and contacted Newkirk on September 7. According to Newkirk, Jackson admitted involvement but claimed he did not rob Zak alone. Jackson refused to identify who was with him, saying he did not want to be a "snitch." Nonetheless, Jackson described the other robber. When asked why the old woman had to be killed, Jackson replied, "I wasn't there at the end," Jackson asked Newkirk to explain what "aggravated robbery and murder" meant. After Newkirk explained, Jackson told Newkirk that the police, after they found the other robber, "would only be able to charge him [Jackson] with maybe robbery or murder, but not aggravated murder."

Aside from his fingerprints, handwriting, and admissions, other evidence linked Jackson to Zak's murder. Jackson was seen a few days after the murder carrying a trash bag toward the park where the register was later found. Another witness recalled seeing Jackson use the Convenient store telephone on the morning of the murder.

According to a laundromat customer, Jackson had demanded a dollar refund from Zak on June 23, two days before the murder, asserting that he had lost a dollar in the change machine. Zak told Jackson to write down his name and phone number and the laundromat owner would call him. Jackson cursed, called Zak names, and left without writing down his name.

At trial, Jackson denied killing or robbing Zak and relied on an alibi. Zak was killed between 11:00 a.m. and 12:30 p.m. According to Jackson, he had stayed at his sister's apartment on June 25 the entire morning. He lived there with his sister, Precious, her boyfriend, Vincent Patton, and, at times, Jackson's girlfriend, Carla Elliott. Just after noon, Jackson and Vincent left, caught a bus, picked up Vincent's mother's car, and drove to a sales job interview at 1:00 p.m.

Precious Jackson testified that when she woke up around 10:30 a.m., Andre was in the apartment and remained there until he left with Vincent just after 12:00. Carla Elliott also testified that Andre stayed in the apartment until he left with Vincent. Vincent testified he stayed with Jackson the entire afternoon after they left the apartment together. Patton's mother corroborated that Vincent picked up her car around 12:30 that day, but she did not see Jackson. Business records reflected that Jackson showed up at 1:00 p.m. for the sales job interview. Vincent and Precious had made prior written statements to the police about that morning that seriously contradicted their alibi testimony.

Jackson testified he had been in the laundromat eight to ten times and had used the toilet there four or five times. He denied leaving his apartment that morning or being in the laundromat on June 25. He denied writing the name Pete Johnson on a pad, or ever confronting Zak about a refund. In his testimony, Jackson denied telling Newkirk he had been involved in the robbery or that he had ever touched the register. Jackson proclaimed his complete innocence. *State v. Jackson*, 57 Ohio St.3d 29, 30–32, 565 N.E.2d 549, 552–54 (1991).

The jury convicted Jackson of aggravated murder, aggravated robbery, and the death penalty specifications alleging murder in the course of aggravated robbery. After a sentencing hearing, the jury recommended death, and the judge imposed the death penalty. 565 N.E.2d at 554.

## III. PROCEDURAL HISTORY

### A. DIRECT APPEAL

In addition to the procedural history of this case set forth in the Factual Background *supra*, the Court notes that on direct appeal the Eighth District affirmed Jackson's convictions and sentences in all respects on October 5, 1989. *See State v. Jackson*, 1989 WL 117434 (Ohio App. 8 Dist.). Subsequently, on January 9, 1991, the Supreme Court of Ohio affirmed the decision of the Eighth District in all respects. *See State v. Jackson*, 57 Ohio St.3d 29, 565 N.E.2d 549. Jackson's Motion for Rehearing was denied by the Supreme Court on October 7, 1991.

On June 3, 1991, Jackson filed a certiorari petition in the United States Supreme Court, which the Court denied on October 7, 1991. *Jackson v. Ohio*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991).

### B. FIRST AND SECOND POST-CONVICTION PETITIONS

On June 23, 1992, Jackson filed his first post-conviction petition in the Common Pleas Court for Cuyahoga County (the "first Petition"). On October 28, 1992, the

trial court issued Findings of Fact and Conclusions of Law denying the first Petition. Jackson failed to timely appeal the court's dismissal of the first Petition.

On October 16, 1992, Jackson filed a second post-conviction petition in the Common Pleas Court for Cuyahoga County assigning the same fifty claims for relief contained in the first Petition, plus twenty-one additional claims (the "second Petition"). On December 7, 1992, the trial court issued Findings of Fact and Conclusions of Law dismissing the second Petition. Jackson failed to timely appeal the court's dismissal of the second Petition.

Jackson then filed the first of three separate motions for relief from judgment pursuant to Rule 60 on October 12, 1993. In this first motion, Jackson asked the trial court to vacate and re-journalize the December 7, 1992, Order dismissing the second Petition. On October 18, 1993, the trial court denied the first motion for relief.

On May 11, 1994, Jackson filed a second untimely motion for relief pursuant to Rule 60(B) in the trial court, in which he requested that the court vacate its October 12, 1993, dismissal of the first Petition and its December 7, 1992, dismissal of the second Petition. On June 20, 1994, the trial court granted the State's motion to dismiss Jackson's second motion for relief from judgment.

On September 8, 1994, Jackson filed his third motion for relief from judgment in the trial court. In this motion, Jackson asked for relief from the June 20, 1994, Order granting the State's motion to dismiss the May 11, 1994, Motion for Relief from Order. On September 23, 1994, the State filed a motion to dismiss Jackson's third motion for relief. On September 30, 1994, the trial court granted the State's motion and dismissed Jackson's third motion for relief from Order. On October 3, 1994, subsequent to the denial of his third Rule 60(B) motion, Jackson filed a response to the State's motion to dismiss.

Jackson had filed untimely notices of appeal from the first and second Rule 60 motions, but he filed a timely notice of appeal from the third Rule 60 motion. The cases were proceeding separately until November 14, 1994, when the Eighth District consolidated all three appeals. On June 22, 1995, the Eighth District dismissed all claims relating to Case Nos. 67025 and 67876 (the untimely appeals from the first two Rule 60 motions), and affirmed the denial of the third motion. The Eighth District cited Jackson's failure to comply with App. R. 4 in holding that it lacked jurisdiction to review the judgments of the trial court. The Eighth District affirmed the trial court's decision in Case No. 68085. The Eighth District also refused to address Jackson's post-conviction claims, and held that Jackson should have appealed directly from the denial of the post-conviction petitions. The Eighth District held that the failure of Jackson to so appeal deprived the court of jurisdiction to consider the claims asserted in the two post-conviction petitions on their merits in the appeal from the denial of the Rule 60 motions.

Jackson then appealed the denial of the Rule 60 motions to the Supreme Court of Ohio by filing a memorandum in support of jurisdiction. On November 22, 1995, the Supreme Court dismissed Jackson's appeal as not involving any substantial constitutional question. On December 4, 1995, Jackson moved for reconsideration, which the Supreme Court denied on December 20, 1995. Jackson then sought a writ of certiorari from the United States Supreme Court, which was denied. *See Jackson v. Ohio,* 517 U.S. 1214, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996).

## C. *MURNAHAN* PROCEEDINGS

While his various post-conviction actions were proceeding, Jackson had filed an Application for Delayed Reconsideration (*Murnahan* motion) in the Eighth District on June 30, 1993. On July 14, 1994, the Eighth District denied all of the claims of ineffective assistance of appellate counsel contained in the *Murnahan* motion. From this denial, Jackson appealed to the Supreme Court of Ohio, which dismissed the appeal on March 23, 1995, for lack of jurisdiction. The court cited Jackson's failure to file a merit brief in compliance with the Rules of Practice of the Supreme Court. On April 3, 1995, Jackson filed a motion to vacate and a motion for reconsideration with respect to the Supreme Court's dismissal of his *Murnahan* motion. On April 25, 1995, the Court denied Jackson's motion for reconsideration, and on May 5, 1995, the Court denied his motion to vacate.

On March 29, 1996, Jackson filed a Motion for Reconsideration and Reopening Relating to Ineffective Assistance of Counsel in the Ohio Supreme Court, which the Court denied on May 8, 1996.

On December 2, 1996, Jackson filed his Petition with this Court.

## IV. INITIAL CONSIDERATIONS

### A. THE AEDPA APPLIES TO THE APPLICATION

The Court notes, as a preliminary matter, that in this case the Petition was filed on December 2, 1996, which was subsequent to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, the AEDPA applies herein. *See Williams v. Coyle*, 167 F.3d 1036, 1037 (6th Cir.1999). *See also King v. Trippett*, 192 F.3d 517, 520 (6th Cir.1999) (*citing Nevers v. Killinger*, 169 F.3d 352, 357 (6th Cir.), *cert. denied*, 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999) and *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir.1997), *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998)).

### B. STANDARD OF HABEAS RE-VIEW UNDER AEDPA

Federal courts may entertain a State prisoner's petition for habeas relief only on the grounds that the prisoner's confinement violates the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a) (1994). A violation of *State* law is not cognizable in a federal habeas proceeding unless the violation is of constitutional magnitude. *See, e.g., Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). *Also see Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("It is not the province of a federal habeas court to reexamine state court determinations on state law questions."). Thus, general improprieties occurring in State court proceedings are cognizable only if they resulted in fundamental unfairness, and consequently violated the habeas petitioner's Fourteenth Amendment right to due process. Relief for violations of *federal* law will be granted only if the violation rises to the level of a "fundamental defect which inherently results in a complete miscarriage of justice." *Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 2297, 129 L.Ed.2d 277 (1994) (*quoting Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)).

Accordingly, for the Petitioner to obtain federal habeas relief, he must first demonstrate that he satisfies the standard set by 28 U.S.C. § 2254(d)(1) which states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . .

In *T. Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Justice O'Connor, writing for a Majority of the Court, explained how § 2254(d)(1) works.

Under [§ 2254(d) ], a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Id.* at 1519.

After setting forth the above construction of § 2254(d), Justice O'Connor explained each part of the statute. With regard to the "contrary to" clause of 2254(d), Justice O'Connor reasoned:

The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. [ ] A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

\* \* \* \* \* \*

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within 2254(d)(1)'s "contrary to" clause.

*T. Williams*, 120 S.Ct. at 1519–20.

With respect to the "unreasonable application" clause of 2254(d)(1), the Court held that, "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause." *T. Williams*, 120 S.Ct. at 1521. Importantly, the Court set forth its interpretation of the clause as follows:

The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning. For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.

\* \* \* \* \* \*

In 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or incorrect. Under 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that

court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be reasonable.

\* \* \* \* \* \*

Under 2254(d)(1), the writ may issue ... if ... the state-court adjudication resulted in a decision that "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

\* \* \* \* \* \*

Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1522.

■ Moreover, Federal courts apply a standard of harmless error review upon collateral review of trial procedures in habeas proceedings different from the standard of harmless error review which they apply in direct appellate review. This means that for purposes of federal habeas review, a constitutional error that implicates trial procedures must be considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahammson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The Sixth Circuit has held that the *Brecht* standard applies to harmless error review in habeas cases even in cases where the federal habeas court is the first to conduct harmless error review. *See Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir.1999).

## C. PROCEDURAL DEFAULT

Rather than undertake the complicated and resource-consuming task of determining (1) which of the Petitioner's claims have been procedurally defaulted, and (2) which of the procedurally defaulted claims, if any, may nonetheless may be considered on the merits pursuant to *Coleman v. Thompson,* 501 U.S. 722, 751, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), and its progeny, the Court chooses to bypass the quagmire of procedural default law presented in this particular case. Therefore, the Court will decide the merits of each of the Petitioner's grounds for relief asserted in his Petition (Dkt.# 14), to the extent the Court is permitted to do so under 28 U.S.C. § 2254(d) (as amended by AEDPA).

The Honorable John M. Manos, Senior United States District Judge, has astutely stated the rationale for proceeding in this fashion:

Not surprisingly, [the Petitioner] and the State offer differing interpretations of Ohio law and disagree over the existence or nonexistence of support for each prong of the procedural default analysis. [The Petitioner] also argues that even if any of his grounds for relief have been procedurally defaulted, such default resulted from the ineffective assistance of counsel which thereby establishes "cause." *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (ineffective assistance of counsel is "cause" for procedural default).

The analysis is further complicated by the narrow (but important) exception to the cause-and-prejudice standard. *See,* e.g., *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. Even assuming that a claim has been procedurally defaulted and the petitioner has not established "cause" and "prejudice" for such default, a court must nonetheless review the merits of the petition to protect against a "fundamental miscarriage of justice." *See*

*Murray,* 477 U.S. at 496, 106 S.Ct. 2639 ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Sawyer v. Whitley,* 505 U.S. 333, 350, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (where a habeas petitioner establishes that but for constitutional error at the sentencing hearing no reasonable juror would have found him eligible for the death penalty, a federal court may grant the writ even in the absence of a showing of cause for the procedural default).

To protect against "fundamental miscarriage of justice," see *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546, the Court has reviewed the petition and finds that all grounds for relief lack merit. Therefore, rather than undertake an extensive analysis of Ohio law on the issue of procedural default, the Court will simply address each ground on the merits.

*Williams v. Coyle,* Case No. 1:96CV793 (N.D. Ohio April 2, 1998) at 29–30.

Accordingly, the Court will consider the Petitioner's claims on their merits.

## D. JACKSON IS NOT ENTITLED TO AN EVIDENTIARY HEARING

On March 30, 1999, the Court issued a 20–page Memorandum Opinion and Order (Dkt.# 56) denying Jackson's motion for an evidentiary hearing. The Court appropriately applied the post-AEDPA standard of review in resolving that motion, and concluded that Jackson's contention that he is entitled to an evidentiary hearing was without merit.

28 U.S.C. § 2254(e)(2) states:

**If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not** **hold an evidentiary hearing on the claim unless the applicant shows that—**

> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The Supreme Court in *M.W. Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), subsequently clarified the standard which Federal courts apply in determining whether an evidentiary hearing is appropriate in habeas corpus proceedings. The Court held that "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 1488. Furthermore, the Court reasoned that "The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of 'failed' is to ensure the prisoner undertakes his own diligent search for evidence." *Id.* at 1490. Importantly, to satisfy the diligence requirement, a petitioner "at a minimum [must] seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.*

■ The diligence requirement exists to preserve comity between the State and Federal courts. "Comity … dictates that

when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *M.W. Williams,* 120 S.Ct. at 1490 (*quoting O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)). The Court additionally explained as follows:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings. Yet comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2).

*Id.* at 1491. The Petitioner sought an evidentiary hearing in state court, which was denied, and thereby satisfied the diligence requirement of § 2254(e)(2). Accordingly, he does not have to "show compliance with the balance of the subsection's requirements," and the Court may hold an evidentiary hearing. *Id.*

However, as the Fifth Circuit persuasively held in *McDonald v. Johnson,* 139 F.3d 1056 (1998), "even if [a petitioner's] claim is not precluded by § 2254(e)(2), that does not mean he *is* entitled to an evidentiary hearing—only that he *may* be." *Id.* at 1059–60. (Emphasis original.) The Fifth Circuit reasoned that "Consistent with AEDPA's goal of streamlining the habeas process, § 2254(e)(2) specifies the situations where evidentiary hearings are *allowed,* not where they are *required.*" *Id.* at 1060. (Emphasis original.) The Fifth Circuit further explained that the determination whether an evidentiary hearing is warranted "is committed to the district court's discretion pursuant to Rule 8 of the Rules Governing § 2254 Cases." [1] *Id.* "In determining whether an evidentiary hearing is proper, the district court may expand the record and consider affidavits, exhibits, or other materials that cast light on the merits of the petition." *Id. See also Cardwell v. Greene,* 152 F.3d 331, 337–38 (4th Cir.1998) (Where the district court expands the record to include documentary evidence "the need for an evidentiary hearing may be obviated.").

After reviewing the entire record of this case, the Court concludes, for the same reasons set forth in the Memorandum Opinion and Order of March 30, 1999 (Dkt.# 56), that an evidentiary hearing is not warranted

## IV. ANALYSIS OF THE PETITIONER'S CLAIMS

The Court has attempted to group similar and/or repetitive claims together where

---

1. Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts states:

 If the petition is not dismissed at a previous stage in the proceedings, the judge, after the answer and the transcript and record of state court proceedings are filed, shall, upon a review of those proceedings and of the expanded record, if any, determine whether an evidentiary hearing is required. If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require.

practicable. Therefore, some claims have been taken out of order.

### A. Pre–Trial Issues

The Court shall first individually discuss Grounds 1–3, 5 and 6 of the Petition which assert various violations of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After discussing Ground 6, the Court will consider the cumulative effect of the alleged suppression of evidence by the prosecution.

In *Brady v. Maryland, supra*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194.[2] Such evidence is material "if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. A reasonable probability is that which is sufficient to affect or undermine confidence in the outcome of a trial. *See id.* Importantly, the suppressed evidence does not need to establish the Petitioner's innocence by a preponderance of evidence to be considered material. *See Schledwitz v. United States*, 169 F.3d 1003, 1011–12 (6th Cir.1999). At issue, then, is whether the Petitioner received a fair trial.

▆▆▆ Thus, there are three essential components of a *Brady* violation: (1) evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) evidence must have been

willfully or inadvertently suppressed by the State; and (3) prejudice ensued. *See Strickler*, 527 U.S. at 282–83, 119 S.Ct. 1936. The duty to disclose information under the *Brady* rule encompasses both exculpatory and impeachment evidence. *See id.*, 527 U.S. at 280, 119 S.Ct. 1936; *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375; *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555; *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir.1994). Impeachment evidence is that which is favorable to the accused and "if disclosed and used effectively, [ ] may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375. *See also United States v. Presser*, 844 F.2d 1275, 1278 (6th Cir.1988).

The Petitioner claims that his right to due process has been violated based on five separate grounds asserted under *Brady v. Maryland:*

**Ground 1. THE PETITIONER'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION WAS VIOLATED WHEN THE STATE FAILED TO DISCLOSE A WITNESS HAVING EXCULPATORY INFORMATION TO THE DEFENSE.**

The Petitioner contends that the State violated his Constitutional rights by withholding the identity of witnesses with potentially exculpatory information. The prosecution had information about Terrence Myrieckes ("Myrieckes"), a twelve-year-old boy who walked past the laundro-

---

**2.** *See Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *United States v. Bag-*

*ley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs*, 427 U.S. 97, 104 n. 10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

mat near the time of the murder of Emily Zak. The prosecution did not present Myrieckes in time for his testimony to be heard during the guilt phase. However, Myrieckes did testify during the penalty phase. The prosecution also withheld information from interviews with two Pete Johnsons, which was the name that appeared in the victim's refund book found at the crime scene. As a result, the Petitioner believes that his due process rights have been violated.

The United States Supreme Court has held that the prosecution's "omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Agurs*, 427 U.S. at 112–13, 96 S.Ct. 2392. With respect to the Petitioner's claim concerning the non-disclosure of Myrieckes by the State, the Ohio Supreme Court made the following findings:

> Just before the sentencing hearing, defense counsel discovered a twelve-year-old witness, Terrence Myrieckes, who testified at the hearing that he had stopped outside the laundromat around 11:15 or 11:30 a.m. on June 25. He looked in the laundromat's window, noticed the cash register was not in its normal place, and saw Zak, alone, standing near the bathroom door. Myrieckes saw a man other than Jackson, carrying a white duffel bag over his shoulder, walk out of the laundromat and place the bag in an automobile trunk. Myrieckes, who played basketball with Jackson, had earlier talked with the police, but had not told them about the duffel bag.

*Jackson*, 565 N.E.2d at 552–54. The State court found that Myrieckes' testimony did not prove the man had a cash register in the duffel bag. The State court also found

that looking into the laundromat, over the machines, to see if the cash register was missing would be very difficult. *See id.* at 552–54. The prosecution provided the following circumstantial evidence: (1) the Petitioner's fingerprints were in the toilet stall where Zak was murdered, (2) the Petitioner admitted to the police that they would find his fingerprints on the cash register, and (3) the handwriting analysis of the paper found at the crime scene which confirmed that the Petitioner wrote the note on the pad used by Zak. Furthermore, the jury rejected the Petitioner's testimony that the robbery and murder were unrelated events as well as that of three alibi witnesses. Furthermore, the Supreme Court of Ohio made the following findings, which also linked the Petitioner to both the robbery and murder: (1) the crimes occurred within a short period of time; (2) the Petitioner knew the location of the register as well as the amount of money missing; (3) he admitted to Captain Newkirk that his fingerprints would be found on the cash register and plastic bags; (4) the plastic bag found with the register matched those found at his apartment complex; (5) the Petitioner had been seen a few days after the murder carrying a plastic bag towards the woods where police located the register; and (6) the Petitioner admitted his involvement in the robbery and murder to Newkirk. *Jackson*, 565 N.E.2d at 552–54. The Ohio Supreme Court ultimately held that a *Brady* violation did not occur.

■ Based on the foregoing, Myrieckes' testimony was not material under *Brady* as there is no "reasonable probability" that the trial result would have been different if Myrieckes' testimony was admitted during the guilt phase. The evidence of the Petitioner's guilt was overwhelming, and Myrieckes testimony was explained away by the prosecution. Accordingly, the Ohio Supreme Court did reach a result that was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

■ The Petitioner also claims that a *Brady* violation occurred when the State failed to disclose that the police had interviewed two individuals by the name of Pete Johnson, which was the name in the victim's refund book found at the crime scene. Though the prosecution is responsible for disclosing all favorable evidence known to them as well as those acting on their behalf, *see Kyles,* 514 U.S. at 437, 115 S.Ct. 1555, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) (Determining that the witness withheld by the prosecution was merely an early lead that the police abandoned when eyewitnesses were found). *See also Arizona v. Youngblood,* 488 U.S. at 55, 109 S.Ct. 333. *Brady* does not encompass information that "might be of use to the defendant in acquiring exculpatory or impeachment evidence that the defendant had thought was unavailable." *United States v. Mullins,* 22 F.3d 1365, 1372 (6th Cir.1994). Moreover, the prosecution is responsible for providing only that which is favorable to the accused and necessary for him to receive a fair trial. *See Bagley,* 473 U.S. at 675, 105 S.Ct. 3375. As such, the prosecution is not required to disclose to the defense every potential suspect questioned by the police.

■ Based on the evidence, there was no reason for the prosecution to turn over the investigatory leads regarding the two Pete Johnsons to the defense. Written on the top sheet of the blue notepad used to record requests for refunds was "Pete Johnson," "681–4975," and "is ac." *Jack-*

*son,* 565 N.E.2d at 552. According to the record, laundromat owner James Horton identified "is ac" as being written by the victim. *See id.* The record also indicated that a handwriting analysis of the paper found at the crime scene revealed that the Petitioner had written "Pete Johnson" and "681–4957." *Id.* As such, there is no reasonable probability that the outcome of the Petitioner's trial would have been different had the prosecution disclosed every possible investigatory lead pursued by the police. Accordingly, the Petitioner cannot demonstrate that his *Brady* rights were violated, and he is not entitled to habeas relief.

For the foregoing reasons, Ground 1 is denied.

**Ground 2. THE PETITIONER HAS BEEN DENIED HIS RIGHTS AS PROTECTED BY THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE STATE HAS DENIED HIM ACCESS TO SEVERAL PIECES OF KEY EVIDENCE IN THIS CASE.**

The Petitioner argues that he is unable to assess the viability of several unspecified claims as he lacks access to the handwritten notes of his oral statement taken by Captain Newkirk. The Petitioner fails to specify the claims to which he is referring. The Petitioner complains that after Newkirk typed a summary of his notes, he lost or displaced the handwritten notes. The Petitioner believes that his due process rights have been violated as a result.

■ The prosecution is not responsible for providing a complete report to the defense of all police investigatory work.

See Moore, 408 U.S. at 795, 92 S.Ct. 2562. Instead, the prosecution has a duty to disclose all evidence that is favorable to the Petitioner. See Brady, 373 U.S. at 87, 83 S.Ct. 1194. The Petitioner was aware of Newkirk's typed summary of his oral statement. However, the Petitioner does not provide any indication that the handwritten notes contained material evidence which differs from the typed summary. The Petitioner, therefore, cannot prove that prejudice ensued. The Petitioner also has not shown that the prosecution illegally suppressed the written notes.

 Additionally, failure to preserve potentially useful evidence does not constitute a denial of due process where the defendant was unable to show bad faith on the part of the police. See Arizona v. Youngblood, 488 U.S. at 58, 109 S.Ct. 333. The Petitioner does not suggest nor does he show that the police acted in bad faith by losing or misplacing the handwritten notes. The Court cannot say that there is a reasonable probability that the result of the trial would have been different had the prosecution produced Newkirk's handwritten notes. Therefore, the Petitioner cannot establish a Brady violation and is not entitled to relief.

**Ground 3. THE PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE STATE'S FAILURE TO DISCLOSE TO THE PETITIONER ALL POSSIBLE EXCULPATORY EVIDENCE AT HIS TRIAL.**

The Petitioner again alleges that the prosecution failed to disclose exculpatory statements of witness Terrence Myrieckes during the guilt phase of the trial which would have exonerated the Petitioner of the aggravated robbery and capital specification. The Court has already denied the Petitioner's Brady claim with respect to the late disclosure of Myrieckes, and will not undertake the analysis again.

 The Petitioner, however, has asserted additional claims that his Brady rights were violated. The Petitioner asserts that the prosecution failed to disclose other unidentified exculpatory information. If the prosecution fails to disclose Brady material, the Petitioner is required to show that there is a reasonable probability that the omission deprived him of a fair trial. See Agurs, 427 U.S. at 108, 96 S.Ct. 2392. See also U.S. v. Frost, 914 F.2d 756, 771 (6th Cir.1990); Presser, 844 F.2d at 1281-82. Where the Petitioner fails to identify the material allegedly withheld, he has failed to meet this burden. Frost, 914 F.2d at 771. Thus, the Petitioner cannot establish a Brady violation with respect to the non-disclosure of evidence which he does not identify.

 The Petitioner also claims that the prosecution violated his due process rights by failing to disclose the fingerprint cards of other suspects. As explained in Ground 2, the prosecution is not responsible for providing a complete report to the defense of all police investigatory work. In light of the evidence of the Petitioner's guilt presented by the State at trial, the prosecution's failure to disclose the fingerprint cards must be evaluated in the context of the entire record. See Agurs, 427 U.S. at 112, 96 S.Ct. 2392. Based on the evidence discussed supra, there is no reasonable probability that the result of the trial would have been different. Accordingly,

the Petitioner has not established a *Brady* violation.

Ground 3, therefore, is denied.

**Ground 5. THE PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT AND HIS RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE STATE'S FAILURE TO DISCLOSE TO TRIAL COUNSEL INFORMATION MATERIAL TO THE GUILT PHASE OF THE PROCEEDINGS.**

 The Petitioner alleges that the prosecution failed to disclose information material to the guilt phase of his trial including the investigation of other suspects, problems with loitering at the laundromat, arguments between the victim and patrons, and evidence that shoe prints left at scene were not Nike shoes. For the same reasoning stated in the preceding discussion of the Petitioner's grounds for relief, the Petitioner fails to show that there is a reasonable probability that the result of the trial would have been different had the prosecution disclosed this information. Accordingly, the Petitioner's right to effective assistance of counsel was not violated by the prosecution's failure to disclose this information.

Accordingly, Ground 5 is denied.

**Ground 6. THE PETITIONER'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE STATE'S FAILURE TO DISCLOSE IMPEACHING INFORMATION TO THE PETITIONER AND BY FAILING TO PROVIDE RELEVANT DISCOVERY OF POTENTIALLY EXCULPATORY EVIDENCE.**

 The Petitioner alleges that the prosecution failed to disclose contradictory statements and criminal records of witnesses, negative test results from forensic analysis, and one witness's failure to choose his photograph as one of the suspicious males she had seen at the scene prior to the crime. The Petitioner provides little argument as to how this information would have benefitted him at trial. For the same reasons stated in the preceding grounds, the Petitioner fails to show that there is a reasonable probability that the outcome of the trial would have been different had this information been disclosed.

To the extent that the Petitioner argues that the above-described evidence may have *led to* the discovery of exculpatory evidence, the prosecution has no duty under *Brady* to disclose such information. *See Mullins,* 22 F.3d at 1372. There is no authority which requires such disclosure. *See id.* Based upon the overwhelming evidence of the Petitioner's guilt, the disclosure of the evidence described by the Petitioner in this Ground would not have created a reasonable probability of a different outcome. Therefore, the Petitioner cannot establish that the non-disclosure of

the above-described evidence violated his due process rights.

Finally, the Court must consider the cumulative effect of the non-disclosure of the evidence described by the Petitioner in Grounds 1–3, 5 and 6. Essentially, the issue is whether the outcome of the trial would have been different had all of the non-disclosed evidence been presented to the jury during the guilt phase of the trial. Based on the overwhelming circumstantial evidence of the Petitioner's guilt set forth in the record, there is no reasonable probability that the outcome of the guilt phase would not have been different had the jury been exposed to the undisclosed evidence in its entirety.

Accordingly, with respect to Grounds 1–3, 5 and 6, the Petitioner is not entitled to habeas relief and each Ground is denied.

**Ground 4. THE PETITIONER'S RIGHTS AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY AN IMPERMISSIBLY SUGGESTIVE PRETRIAL IDENTIFICATION PROCESS WHICH WAS USED BY THE STATE IN THIS CASE.**

The Petitioner asserts that prior to identifying him at trial, the State's three identification witnesses were shown a lineup and a photograph array which were impermissibly suggestive. The Petitioner claims that of the men in the lineup and photographic array, he was the only one with a visible mustache. Based on the nature of the lineup and photographic array, the Petitioner claims that his Constitutional rights were violated as set forth above.

The Court in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), summarized the law with respect to suggestive identification of individuals suspected of committing crimes. The Court explained that a "defendant could claim that 'the confrontation conducted ... was so unnecessarily suggestive and conductive to irreparable mistaken identification that he was denied due process of law.'" *Id.* at 196, 93 S.Ct. 375 (*citing Stovall v. Denno*, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). Further, the Court restated the governing test for a due process violation where a trial witness's identification of the defendant stemmed from a suggestive photographic array as follows:

> We hold that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 196–97, 93 S.Ct. 375 (*quoting Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). The Court also established "general guidelines" with respect to "the relationship between suggestiveness and misidentification." *Id.* at 198, 93 S.Ct. 375. The Court stated that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id.* Importantly, "[it] is the likelihood of misidentification which violates a defendant's right to due process...." *Id.* Therefore, "[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.*

The Petitioner has not provided this Court with any factual or legal basis for

concluding that the pre-trial identification procedure used by the police "[gave] rise to a very substantial likelihood of irreparable misidentification." The Petitioner has devoted three sentences to this claim in his Petition, failed to address it in his Traverse, and has not cited to any evidence in the record which supports his claim. Consequently, the Petitioner has not established that the pre-trial identification process resulted in a violation of his due process rights such that he is entitled to habeas relief. Ground 4, therefore, is denied.

## B. Trial Issues

The following is a discussion of the grounds for relief raised by the Petitioner with respect to issues that arose during the trial phase of his case.

## Ground 7. THE TRIAL COURT ERRED BY FAILING TO SUPPRESS STATEMENTS BY THE PETITIONER TO POLICE CAPTAIN PATRICK J. NEWKIRK, IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The Petitioner contends that incriminating oral statements which he made to Captain Newkirk on September 7, 1988, should not have been allowed at trial because those statements were obtained in violation of Petitioner's right to counsel, pursuant to the United States Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Petitioner disputes the factual finding of the Ohio courts that Petitioner initiated the conversation with Newkirk, during which the incriminating statements were made, and claims that it was Newkirk who initiated the conversation.

The Petitioner asserts that he requested the assistance of counsel on September 6, 1988, and that the statements he gave the following day were obtained in violation of his *Miranda* rights.

### a. Presumption of Correctness in Federal Habeas Corpus Proceedings

State court factual determinations are presumed correct in federal habeas proceedings, and the Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also, Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

The Ohio Supreme Court made the following factual determinations relevant to Petitioner's present claim:

On September 5, Detective Schafer advised Jackson of his Miranda rights, and Jackson said he wanted to think about it overnight before making a statement. On September 6, Schafer again advised Jackson of his rights. Jackson waived his rights and wrote out a statement. Then Jackson changed his mind, scratched his signature off the waiver, and said, "I better talk to a lawyer first." Schafer stopped questioning Jackson and returned him to his cell. Captain Newkirk was not present during this interview.

On September 7, Newkirk was working, but Detective Schafer was not. Around 5:00 p.m., right before quitting time on Labor Day, Newkirk received a jailer's message that Jackson wanted to see him.... Newkirk then talked with Jackson and advised him of his rights. According to Newkirk's typed notes of the meeting, which he read during his testimony, "Andre stated that he understood his rights and was willing to talk to me about 'this' but he did not want to

sign the form or anything else." Jackson was worried about his mother's health and how she was to be told of his arrest. Jackson wanted his mother to be with Precious when his mother was told. Newkirk took notes during the interview and showed them to Jackson, who agreed they were accurate; then the notes were typed into a memo. During the interview, Jackson, while admitting complicity in the robbery, tried to focus responsibility for the murder on an unnamed accomplice.

565 N.E.2d at 556. The Supreme Court of Ohio found that Petitioner freely sent for and initiated communications with Captain Newkirk on September 7, 1987, a finding supported by the record and thus binding on this Court. *See id.* The Petitioner has not introduced any evidence to rebut the findings of the Ohio Supreme Court. Therefore, this Court is bound to presume the correctness of the Ohio Supreme Court's factual determinations.

**b. Petitioner's Incriminating Statements Were Not Obtained in Violation of His Miranda Rights Nor His Right to Counsel.**

 The Petitioner has claimed that his right to counsel was violated based on Newkirk's allegedly improper interrogation on September 7, 1988. The Petitioner's claim is without merit. Once a suspect requests the assistance of counsel, the police may not continue to interrogate him until counsel has been made available to him, "*unless* the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. at 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (Emphasis added). Even when an accused initiates further communications with the police after requesting counsel, there is still a significant burden on the prosecution to demonstrate that the accused "knowingly and intelligently"

waived his Fifth Amendment right to the presence of counsel during interrogation. *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). Refusal to sign a waiver form does not preclude a finding that an accused has waived his right to counsel. *United States v. Caulton,* 498 F.2d 412, 413 (6th Cir. 1974). Instead, a voluntary, knowing, and intelligent waiver will be determined by "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *North Carolina v. Butler,* 441 U.S. 369, 374–375, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

The Supreme Court in *Butler* reversed the North Carolina Supreme Court's requirement of an explicit waiver of the right to have counsel present during police interrogation. *See Butler,* 441 U.S. at 374–75, 99 S.Ct. 1755. The respondent in *Butler* had been fully advised of his Miranda rights at the time of his arrest. However, he refused to sign a waiver form, stating: "I will talk to you but I am not signing any form." *Id.* at 371, 99 S.Ct. 1755. The respondent subsequently made incriminating statements which were admitted into evidence following the trial court's denial of the respondent's motion to suppress, and the respondent was found guilty of each offense charged. *See id.* at 372, 99 S.Ct. 1755. On appeal, the North Carolina Supreme Court ordered a new trial on the ground that the respondent's incriminating statements to F.B.I. agents were inadmissible as evidence, since the respondent had made no explicit written or oral waiver of his right to have counsel present. *See id.* In reversing, the United States Supreme Court held that while an express written or oral statement of waiver may be strong proof of a valid waiver, neither is necessary nor sufficient to establish a valid waiver. *See id.* at 373, 99 S.Ct. 1755.

Based on the uncontroverted facts, the Petitioner made a knowing and intelligent waiver of his right to have counsel present during his September 7, 1988, conversation with Newkirk. There is no evidence to the contrary. Accordingly, the Ohio Supreme Court's consideration of the claims set forth in Ground 7 did not result in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Ground 7, therefore, is denied.

### Ground 8. THE TRIAL COURT ERRED BY OVERRULING THE PETITIONER'S MOTION TO SUPPRESS FINGERPRINT EVIDENCE IN HIS TRIAL IN CONTRAVENTION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Petitioner next contends that he was arrested on September 4, 1987, without probable cause and that therefore the subsequent taking of his fingerprints was a violation of his Fourth Amendment rights.

### a. *Stone v. Powell,* 428 U.S. 465 (1976), Precludes This Court's Review of Petitioner's Fourth Amendment Claim.

Even assuming Petitioner's fingerprints were taken illegally, the Supreme Court's holding in *Stone v. Powell, supra,* precludes this Court's review of the Petitioner's Fourth Amendment claim. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. 3037. In order to determine whether

Petitioner was given a full and fair opportunity to litigate his Fourth Amendment claim, the Sixth Circuit requires two inquiries: (1) whether a state's procedural mechanism allows the opportunity to present a Fourth Amendment claim; and (2) whether Petitioner's presentation of his claim was "in fact frustrated because of a failure of that mechanism." *Riley v. Gray,* 674 F.2d 522, 526 (6th Cir.), *cert. denied,* 459 U.S. 948, 103 S.Ct. 266, 74 L.Ed.2d 207 (1982).

With respect to the first inquiry, the State mechanism provides criminal defendants with the opportunity to raise Fourth Amendment claims. Rule 12 of the Ohio Rules of Criminal Procedure allows a pre-trial motion to suppress evidence. Further, a criminal defendant may directly appeal a denial of his motion to suppress evidence. *See* Ohio R.App.P. 3(A) and Ohio R.App.P. 5(A). The *Riley* Court held that these mechanisms are adequate to satisfy the first prong of inquiry into whether the Petitioner was given a fair and full opportunity to present his Fourth Amendment claim. *See Riley,* 674 F.2d at 526.

With respect to the second part of the Court's determination, there is nothing to indicate that the Petitioner's opportunity to present his claim was frustrated by any State court mechanisms. As Respondent notes, the Petitioner was at all times represented by counsel; counsel timely filed a pre-trial motion to suppress fingerprint evidence; the trial court, pursuant to such motion, held an evidentiary hearing at which the arresting officers testified, and during which counsel for Petitioner was given the opportunity to cross-examine the arresting officers and to present evidence on Petitioner's behalf. The trial court denied the Petitioner's motion to suppress only after considering the available evidence. (Tr. at 251–254.) Likewise, the Ohio Court of Appeals, Eighth District,

and the Ohio Supreme Court, both considered the Petitioner's Fourth Amendment claims, and affirmed the trial court's holding. *See Jackson*, 565 N.E.2d at 557; *State of Ohio v. Jackson*, No. 55758, 1989 WL 117434 (Ohio Ct.App., 8th Dist.).

 Thus, because the State court mechanisms provided the opportunities to present a Fourth Amendment claim, and because such mechanisms in no way frustrated Petitioner's ability to present his claims, the Petitioner is not entitled to habeas review of his Fourth Amendment claim.

**b. Even if *Stone* Did Not Preclude Consideration of Petitioner's Fourth Amendment Claim, Petitioner's Argument Has No Merit.**

The Petitioner relies on *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), to argue that he was arrested without probable cause, that the police arrested him based on pretext, and that the subsequent taking of his fingerprints was therefore a violation of his Fourth Amendment rights.

The Petitioner misapplies *Davis* to the circumstances of his case. *Davis* involved a police roundup of at least 24 black youths in response to a rape victim's report that she had been assaulted by a black youth. *See id.* at 722, 89 S.Ct. 1394. The police had no probable cause to arrest any of the youths, but all were subsequently released. *See id.* When Davis was arrested, without probable cause, the police took his fingerprints and soon found that they matched those taken from the scene of the crime. *See id.* The Supreme Court ultimately reversed Davis' conviction, holding that the lack of probable cause for his arrest rendered the taking of his fingerprints a constitutional violation. *See id.* at 728, 89 S.Ct. 1394.

 Unlike the defendant in *Davis*, however, the Petitioner was never illegally detained. The Petitioner was initially questioned only as a witness, and was subsequently arrested because of his detailed knowledge of the crime, and because he suggested that the police would probably find his fingerprints on the cash register found in the woods. *See Jackson*, 565 N.E.2d at 557. There was no pretext involved in the Petitioner's arrest, and the police had probable cause to arrest him for tampering with evidence.

Lastly, Petitioner cites to *Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 1756, 123 L.Ed.2d 407 (1993), where the Supreme Court affirmed the granting of habeas corpus where the police used trickery to secure a confession. The holding in *Withrow*, however, has no application to Petitioner's claims here, since no tricks, lies, or pretexts were found to have been used in Petitioner's arrest.

Accordingly, Ohio Supreme Court's adjudication of the merits of the claims set forth in Ground 8 did not result in a decision that was "contrary to, or involve[ ] an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Ground 8, therefore, is denied.

**Ground 9. THE TRIAL COURT ERRED BY ALLOWING THE STATE'S HANDWRITING EXPERT TO TESTIFY THAT HIS WORK HAD BEEN REVIEWED BY HIS SUPERIOR, THEREBY DENYING THE PETITIONER HIS RIGHT TO CONFRONTATION AND TO A FAIR TRIAL AS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner asserts that when Stephen Greene ("Greene") of the Ohio Bu-

reau of Criminal Identification testified as a handwriting expert he insinuated that his supervisors reviewed his work and concurred in his opinion. Greene testified that he examined the Petitioner's handwriting on three documents, compared those samples with the handwriting found in the notepad at the laundromat—the name "Pete Johnson" and a telephone number, and concluded that the Petitioner had written the aforementioned. The Ohio Supreme Court concluded that "no basis exists to speculate that the jury drew prejudicial inferences from questions that the trial judge ordered not to be answered." *Jackson,* 565 N.E.2d at 558.

The Confrontation Clause states that "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. It is axiomatic that the Confrontation Clause is applicable to the States and that "the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Lee v. Illinois,* 476 U.S. 530, 539–540, 106 S.Ct. 2056, 90 L.Ed.2d 514 *quoting Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (citing cases). The Court further held that "the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Id.* (*quoting Pointer,* 380 U.S. at 405, 85 S.Ct. 1065). Importantly, the Court recognized the importance of confrontation and cross-examination in fostering "the pursuit of truth in criminal trials" by

(1) insur[ing] that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forc[ing] the witness to submit to cross examination, the "greatest legal

engine ever invented for the discovery of truth;" (3) permit[ting] the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility.

*Lee,* 476 U.S. at 540, 106 S.Ct. 2056.

The Petitioner's argument that he was denied his right to confront witnesses is without merit. The trial court sustained a defense objection to the prosecutor's questioning of Greene about the opinions of other handwriting experts who concurred with his conclusions about the handwriting in the notepad. *See Jackson,* 565 N.E.2d at 557–58. Therefore, the opinions of other handwriting experts not presented by the prosecution at trial, but to which Greene referred, were never before the jury. Accordingly, the Petitioner's right to confront witnesses was not violated.

The Court, therefore, concludes that the Ohio Supreme Court's adjudication of the Petitioner's claim in Ground 9 did not result in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Ground 9 is denied.

**Ground 10. THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING INTO EVIDENCE A SERIES OF GRUESOME PHOTOGRAPHS WHICH CONTAINED LITTLE PROBATIVE VALUE THEREBY DENYING THE PETITIONER'S RIGHT TO DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner alleges that his due process and fair trial rights were violated

when the trial court allowed photographs of the crime scene and victim to be entered as exhibits for the jury's consideration. The Petitioner acknowledges that under Ohio law gruesome photographs are admissible as long as the danger of material prejudice to a defendant is outweighed by the probative value of the photographs, and they are not repetitive or cumulative in nature. *See State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768, 791 (1984). Importantly, the Ohio Supreme Court determined that the danger of prejudice to the Petitioner did not outweigh the probative value of the photographs introduced at trial. The court stated:

Jackson argues in his seventh proposition of law that certain gruesome photographs were cumulative and that their prejudicial effect outweighed their probative value. The state, disputing error, contends all photographs were noncumulative and highly probative. Under Evid.R. 403 and 611(A), admission of photographs is left to the sound discretion of the trial court. *State v. Landrum*, 53 Ohio St.3d 107, 121, 559 N.E.2d 710, 726 (1990); *State v. Maurer*, 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791 (1984). Nonrepetitive photographs in capital cases, even if gruesome, are admissible if relevant and probative as long as the probative value of each photograph outweighs the danger of material prejudice to an accused. *See State v. Maurer, supra*, paragraph seven of the syllabus; *State v. Morales*, 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273 (1987).

The coroner described the nature and extent of Zak's injuries, including the number of blows the assailant inflicted and the type of force used. The coroner's photographs illustrated his testimony. Other photos, depicting Zak's body at the scene, illustrated police testimony. All the disputed photos helped to establish the assailant's intent, an issue on which the prosecution had the burden of proof. The recurring pattern in the bruises, prominent in the photos, was highly relevant. In July, Jackson said the murderer had to get rid of his shoes because the police had footprints. At trial, Jackson claimed that he had thrown away a pair of tennis shoes in May that he had just purchased in April. Zak's injuries, resulting from crushing impacts to her neck and trunk, as if she had been stepped on, also helped to explain why Jackson's fingerprint and palm print were located so high on the toilet stall wall.

The trial judge carefully considered all offered photographs and excluded several from evidence. The photographs that he admitted, illustrative of testimony, were relevant and probative on disputed issues and not cumulative. Jackson has failed to prove that the trial judge abused his discretion. *State v. Morales, supra.*

565 N.E.2d at 559.

■ For the Petitioner to prevail on Ground 10, he must demonstrate that the admission of the photographs at trial deprived him of a fundamentally fair trial. *See Garrett v. Parke*, 892 F.2d 79, 1989 WL 153553, *1 (6th Cir.) (*citing Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir.1982), *cert. denied*, 463 U.S. 1212, 103 S.Ct. 3547, 77 L.Ed.2d 1395 (1983)). After reviewing the record, including the crime scene and autopsy photographs, this Court agrees with the determination made by the Supreme Court of Ohio. As the State Court found, the photographs illustrated the testimony of the coroner and the police investigators, and also explained the location of the finger- and palm-prints on the toilet stall wall. The gruesome nature of the photographs must certainly be weighed

against their probative value. However, there is no evidence that the State courts, either the trial court or any of the courts reviewing this issue, failed to weigh the appropriate considerations in determining whether to admit the photographs. As such, the Ohio Supreme Court's adjudication of the Petitioner's claim concerning the admission of the photographs utilized by the prosecutor during trial did not result in a decision that was "contrary to, or involve[ ] an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Accordingly, Ground 10 is denied.

Grounds 11 and 21 will be considered together because they both concern the trial court's instructions to the jury during the guilt phase of the Petitioner's trial.

**Ground 11. THE PETITIONER'S RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE FAILURE OF THE TRIAL COURT TO INSTRUCT THE JURY REGARDING THE LESSOR INCLUDED OFFENSE OF MURDER.**

**Ground 21. THE TRIAL COURT COMMITTED NUMEROUS ERRORS IN INSTRUCTING THE JURY IN THE GUILT PHASE OF THE PETITIONER'S TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner has asserted that the trial court's instructions were flawed in 5 respects: (1) the trial court failed to instruct the jury on the lesser included offense of murder;[3] (2) the trial court failed to give the jury a cautionary instruction on eyewitness identification; (3) the trial court erroneously instructed the jury that they could infer the Petitioner's purpose to cause the death of the victim by his commission of an aggravated robbery; (4) the trial court improperly lowered the State's burden of proof by instructing the jury on the civil standard of foreseeability rather than on specific intent; (5) the trial court, in its instruction concerning the capital specification, (a) failed to inform the jury that the specification must be proven beyond a reasonable doubt, and (b) misstated the elements of the specification. The Petitioner concludes that he was deprived of his rights to due process, equal protection, and a fair guilt determination as a result of these purported errors. Each of the Petitioner's claims will be dealt with in turn and their cumulative affect on the trial assessed.

**a. Paragraphs 28 & 76. The trial court failed to instruct the jury on the lesser included offense of murder.**

In Grounds 11 and 21, the Petitioner asserts that the trial court failed to instruct the jury on the lesser included offense of murder. In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Court held that "it has long been 'beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" *Id.* at 635, 100 S.Ct. 2382 *citing Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). Furthermore, the Court reasoned that

---

**3.** The Petitioner alleges this error in Grounds 11 and 21 respectively.

"when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637, 100 S.Ct. 2382. Subsequently, the Court, in *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), restated its holding that "the jury must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.'" *Id.* at 610, 102 S.Ct. 2049.

The Supreme Court of Ohio made the following findings of fact in Part I of its opinion:

[T]he evidence linked Jackson to both the robbery and the murder. Both the robbery and the murder occurred within a short time. Jackson knew the register's location and the amount of money missing, and he admitted his fingerprints would be on the register. The register keys had been taken from Zak's body. Plastic bags in Jackson's apartment matched the one found with the register, and Jackson was seen a few days after the murder carrying a plastic bag towards the wooded area where police found the register. Also, Jackson admitted complicity in the robbery. Neither logic nor other evidence supports Jackson's speculation that the robbery and murder were unrelated events or that Jackson may have killed Zak out of rage because Zak had not given him a refund two days earlier.

*Jackson,* 565 N.E.2d at 555. The State Supreme Court explained that:

From the evidence, the jury concluded that Jackson intended to rob or had robbed Zak when he killed her. Jackson's intent is evident from his pretrial admissions and the physical evidence. Zak's purse and its contents were on the floor. Desk drawers were pulled out, evidencing ransacking. Not only was the register missing, but so were the register keys that had been pinned to Zak's smock. *The robbery and murder were clearly related* . . . .

*Id.* at 559. (Emphasis added.)

The Supreme Court of Ohio reasoned that the Petitioner was not entitled to an instruction on the lesser included offense of murder because it was not reasonably raised by the evidence presented at trial. Specifically, the State Supreme Court held that:

Contrary to Jackson's claim, the evidence does not reasonably suggest that [Jackson] killed Zak but did not rob her. The evidence, including his admissions, his knowledge about the register and money taken, linked Jackson to both the robbery and the murder, and his intent to rob was clearly apparent from the physical evidence. [Citation omitted.] The evidence does not reasonably support acquittal on the felony-murder and conviction for murder alone; hence, the evidence does not satisfy the test for a lesser included offense.

*Jackson,* 565 N.E.2d at 560. (Citation omitted.)

 Based upon the findings of the Supreme Court of Ohio, and upon a review of the record, the Court concludes that the evidence simply does not support an instruction on the lesser included offense of murder in this case.[4] As such, the Court concludes that the Petitioner has not

---

4. Furthermore, the case the Petitioner cites in support of his argument, *Cordova v. Lynaugh,* 838 F.2d 764 (5th Cir.1988) is distinguishable from the case *sub judice.*

shown that the adjudication of this claim by the Supreme Court of Ohio violated the provisions of 28 U.S.C. § 2254(d)(1). Accordingly, the Petitioner is not entitled to relief and the sub-claim contained in Paragraphs 26 and 76 are denied.

**b. Paragraph 77. The trial court failed to give the jury a cautionary instruction on eyewitness identification.**

The Petitioner has challenged the trial court's failure to instruct the jury regarding eyewitness identification as a violation of his Eighth and Fourteenth Amendment rights. The Petitioner has not thoroughly briefed this issue. Nevertheless, the Court has considered the claim.

The Ohio Supreme Court in *State v. Guster*, 66 Ohio St.2d 266, 421 N.E.2d 157 (1981), held that "[t]he determination whether a cautionary instruction of the type in question should be given will ... depend in large measure on whether a resolution by the jury of the disputed issues in the case requires or will be clearly assisted by the instruction." In *State v. Dale*, 3 Ohio App.3d 431, 445 N.E.2d 1137 (1982), the court of appeals held that the trial court erred in failing to give an eyewitness identification instruction because "[m]any of the infirmities which are said to attach to eyewitness identification are present under the evidence of this case." *Id.* at 1140. The court described the infirmities as follows:

[T]here are numerous instances where eyewitness identification testimony is conflicting and confusing, indicating that it may have been unreliable. For example, one eyewitness said defendant was the perpetrator of the offense, while two said he was not; the opportunity of the eyewitnesses to observe the perpetrator of the crime was limited in time, and in some instances by distance; the testimony of the defense's two eyewitnesses concerning the apparel worn by the perpetrator was confusing and conflict-

ing; [ ] [the witness'] capacity to observe the perpetrator may have been limited by poor eyesight; she was unable to identify defendant on one occasion, but was able to do so on others; and her identification of the defendant's photograph may have been influenced by the circumstances of the identification procedure.

*Id.* at 1140–41. The court ultimately held that "[t]he confusion resulting from eyewitness testimony could not be resolved adequately only by instructing the jury that it was the judge of the credibility of witnesses; rather, in this case, it was necessary to specifically direct the jury's attention to the very nature of, and the potential problems of reliability inherent in, eyewitness testimony itself." *Id.* at 1141. None of the infirmities which the *Dale* court found to be present, or any like them, have been asserted by the Petitioner.

■ Consequently, the Petitioner has not provided any basis for his claim that the trial court's failure to instruct on eyewitness identification resulted in fundamental unfairness, and consequently a violation of his due process rights. The Petitioner's claim in Paragraph 77 is denied.

The Court will consider the related claims set forth in Paragraphs 78 and 79 together.

**c. Paragraph 78. The trial court erroneously instructed the jury that they could infer the Petitioner's purpose to cause the death of the victim by his commission of an aggravated robbery.**

**d. Paragraph 79. The trial court improperly lowered the State's burden of proof by instructing the jury on the civil standard of foreseeability rather than on specific intent.**

■ The Defendant's claims in Paragraphs 78 and 79 have no basis in the

record. The trial court instructed the jury as follows:

In count one the Defendant is charged with aggravated murder. Aggravated murder is purposely causing the death of another while committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated robbery.

Before you can find the Defendant guilty in count one, you must find beyond a reasonable doubt that Emily Zak was a living person and that on or about the 25th day of June 1987, and in Cuyahoga County, Ohio, the Defendant purposely caused the death of Emily Zak while the Defendant was committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated robbery.

You must further find beyond a reasonable doubt that the killing of Emily Zak was done purposely and with specific intent.

What does purposely mean? Purpose to kill is an essential element of the crime of aggravated murder. A person acts purposely when it is the specific intention to cause a certain result. It must be established in this case that at the time in question, there was present in the mind of the Defendant, a specific intent to kill Emily Zak while committing or attempting to commit aggravated robbery.

Purpose is a decision of the mind to do an act with a conscious objective or producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.

The purpose with which a person does an act or brings about a certain result may be determined from the manner in which it is done, the means or weapons used and all of the other facts and circumstances in evidence.

**What does specific intent mean? No person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. Specific intent is no more nor less than a particular intent prescribed [sic] by statute. The killing must have been done purposely and with specific intent to cause the death of Emily Zak by the Defendant, Andre Jackson.**

A person who commits or attempts to commit aggravated robbery may be inferred, [sic] because he committed the offense by force or violence, or because the offense and the manner of its commission would be likely to produce death, to have intended to cause the death of any person who is killed during the commission of, attempt to commit or flight from the commission of, or attempt to commit aggravated robbery.

However, the inference is not conclusive. The inference may be considered in determining intent. You are to consider all of the evidence as indicative of either the Defendant's intent or lack of his intent to kill, in determining whether the Defendant had the specific intent to cause the death of Emily Zak.

We used the term deadly weapon. Deadly weapon means any instrument capable of inflicting death or specifically designed or adapted for use as such a weapon.

If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to kill may be inferred from the use of the weapon. Such an inference is not conclusive and may be accepted or rejected by you in your deliberations. If you

accept such an inference, then you must not consider it in and of itself as conclusive, but you may consider it with the totality of all the evidence, evidentiary facts and circumstance bearing upon the issue of intent.

It is charged that the act of the Defendant caused the death of Emily Zak. Cause is an act which, in the normal and continuous sequence of events, produces the death and without which the death would not have occurred when the death is the natural and foreseeable result of the act.

A death is the result of an act when it is produced directly by the act in a natural and continuous sequence and would not have occurred without the act. Result occurs when the death is naturally and foreseeably caused by the act.

The causal responsibility of the Defendant for and unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow in the ordinary course of events from an unlawful act.

The test for foreseeability is not whether the Defendant should have foreseen the injury in its precise form. The test is whether a reasonably prudent person, in the light of all of the circumstances, would have anticipated that death was likely to result to anyone from the performance of an unlawful act.

**As previously stated, before you can find the Defendant guilty of aggravated murder in the first count, you must find beyond a reasonable doubt that Emily Zak's death was purposely and with specific intent caused by the Defendant in accordance with these instructions of law herein given, while the Defendant was committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated robbery.**

(Tr. at 1786–91.) (Emphasis added.) Based upon the foregoing, the Court concludes that the trial court properly instructed the jury with respect to the specific intent requirement for aggravated murder, and did not impermissibly lower the burden of proof by also instructing the jury on foreseeability. Consequently, the Petitioner has not established that fundamental unfairness resulted from the instructions given by the trial court such that his due process rights were violated. The sub-claim contained in Paragraphs 78 and 79, therefore, are denied.

**e. Paragraph 80. The trial court, in its instruction concerning the capital specification, (a) failed to inform the jury that the specification must be proven beyond a reasonable doubt, and (b) misstated the elements of the specification.**

The Petitioner has argued that the trial court failed to inform the jury of the burden of proof with respect to the capital specification, and that the trial court misstated the elements of the specification. The trial court instructed the jury as follows:

As previously stated, before you can find the Defendant guilty of aggravated murder in the first count, you must find beyond a reasonable doubt that Emily Zak's death was purposely and with specific intent caused by the Defendant in accordance with these instructions of law herein given, while the Defendant was committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated robbery. The aggravated robbery charge in count three is the basis of this element of the aggravated murder charge in count one.

As an element of aggravated murder, the Defendant is charged with aggravated robbery. Before you can find the Defendant guilty of aggravated robbery, **you must find beyond a reasonable doubt** that on or about the 25th day of June, 1987, and in Cuyahoga County, Ohio, the Defendant knowingly obtained or attempted to obtain the property of another, to wit, Emily Zak, without Emily Zak's consent, for the purpose of depriving Emily Zak of her property, or the Defendant fled immediately after obtaining or attempting to obtain another's property as described above, and did inflict or attempt to inflict serious physical harm on another, to wit, Emily Zak. In this case property of Emily Zak extends to include property that you find she had custody or control over.

\* \* \* \* \* \*

If after a full and impartial consideration of all the evidence you find **beyond a reasonable doubt** that the Defendant purposely and with specific intent caused the death of Emily Zak on or about June 25, 1987, while fleeing immediately after committing or attempting to commit aggravated robbery, your verdict must be guilty as to the charge of aggravated murder in count one.

**If after a full and impartial consideration of all the evidence you find the State failed to prove beyond a reasonable doubt any one or more of the elements of aggravated murder as charged in count one, your verdict must be not guilty as to the charge of aggravated murder.**

\* \* \* \* \* \*

**If after a full and impartial consideration of all of the evidence you find that the State has proved beyond a reasonable doubt all of the elements of the specification, your verdict must reflect that finding. If after a full**

**and impartial consideration of all the evidence you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the specification, you verdict likewise will reflect that finding.**

(Tr. at 1791, 1794–1795, 1797–98.)

The above-stated jury instructions clearly state that the burden is on the prosecution to prove each and every element of the offense charged beyond a reasonable doubt. Moreover, the jury instructions clearly define the elements of the capital specification in accordance with Ohio law. The Petitioner has made neither a factual or legal argument with respect to the claim he states in Paragraph 80 of his Petition. Accordingly, the trial court's instructions did not result in fundamental unfairness at trial such that the Petitioner's constitutional rights were violated. The claim contained in Paragraph 80, therefore, is denied.

Based upon the foregoing analysis, Grounds 11 and 21 are denied.

**Ground 12. THE PETITIONER'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BECAUSE OF THE ADMISSION OF PREJUDICIAL "PRIOR BAD ACTS" EVIDENCE AT THE GUILT PHASE OF HIS TRIAL.**

The context of this claim is important in determining its merit. The Petitioner and the Respondent both agree that the "prior bad acts" evidence that was presented to the jury during the guilt phase was elicited

from a defense witness, Carla Elliott ("Elliott"), in response to a leading question by the prosecutor. The exchange was summarized as follows in the opinion issued by the Ohio Supreme Court in their adjudication of the merits of this claim:

> In proposition of law ten, Jackson claims the prosecutor improperly cross-examined Carla Elliott, a defense witness in the sentencing phase, thereby depriving Jackson of his constitutional rights. On direct examination, Carla told the jury Jackson was friendly, "the sweetest person" you could ever meet, who never struck her or anyone else and would "always walk away" from their arguments. On cross-examination, she agreed Jackson was a "peaceful, loving person," who was nonviolent. The prosecutor then asked her if she knew that Jackson had assaulted and robbed three older women in 1983 and assaulted another woman in 1985. Elliott replied that knowledge of these assaults would not change her opinion about Jackson's character.

*Jackson,* 565 N.E.2d at 560.

 As the Ohio Supreme Court held, it is well-settled under Ohio law that "[u]nder Evid. R. 405(A), 'inquiry is allowable into relevant specific instances of conduct,' on cross-examination, to challenge the opinion of a character witness." *Jackson,* 565 N.E.2d at 560 (citing cases). Accordingly, the Ohio Supreme Court concluded that "[i]n this case, [Elliot's] characterization of Jackson as sweet, gentle, and nonviolent opened the door for cross-examination about specific instances of conduct sharply at variance with her opinion testimony." *Id.* The Ohio Supreme Court did not apply Federal law in making its determination on this issue. As such, because the admission of the Petitioner's prior criminal conduct did not result in fundamental unfairness, his due process rights were violated.

The remainder of the claims made by the Petitioner in Ground 12 amount to no more than harmless error. None of the information that was improperly admitted by the trial court could have resulted in "substantial and injurious effect or influence in determining the jury's verdict," considering the overwhelming evidence of the Petitioner's guilt which was presented at trial. *See Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

Accordingly, Ground 12 is denied.

**Ground 13. THE CONDUCT BY THE COUNTY PROSECUTOR DURING THE GUILT PHASE OF THE PETITIONER'S CAPITAL TRIAL DEPRIVED HIM OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND A RELIABLE DETERMINATION OF GUILT AND PUNISHMENT AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner has made the following claims in connection with Ground 13: (1) the prosecutor untimely disclosed fingerprint evidence, the State's witness list, and other documentary evidence prior to the guilt phase of the trial; (2) the prosecutor bolstered the testimony of witnesses; (3) the prosecutor made improper arguments to the jury and appealed to the jury's sympathy for the victim; (4) the prosecutor gave personal opinions as to the strength of the State's case; (5) the prosecutor argued that uncharged or prior violent acts committed by the Petitioner demonstrated his propensity for violence; (6) the prosecutor used a toilet as demonstrative evidence. The Petitioner has not of-

fered any further argument in support of these claims.

As an initial matter, the Petitioner has not provided any evidence that the prosecutor failed to provide him with fingerprint evidence in the State's possession prior to trial. The Court has already addressed this claim in the context of the Petitioner's *Brady* claims and need not revisit the issue here. Furthermore, the Petitioner has not cited to any evidence in the record which established that the prosecution provided its witness list and other documentary evidence in an untimely manner. Consequently, the sub-claim contained in Paragraph 37 is without merit.

Moreover, the Petitioner has argued in Paragraph 40 that the prosecutor improperly opined, based upon the Petitioner's unsworn statement, that the Petitioner was not remorseful for his actions. The sub-claim of prosecutorial misconduct during the penalty phase contained in Paragraph 40 will be considered in this Court's analysis of Ground 27.

 The Petitioner concedes that his counsel failed to object to any of the alleged instances of misconduct during the guilt phase of the trial. There is no error where there is a failure to object and the misconduct could have been resolved by timely objection. *See Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir.1988). However, where defense counsel does not object, the Court must review the alleged prosecutorial misconduct for plain error. The Sixth Circuit in *United States v. Carter*, 236 F.3d 777 (6th Cir.2001), restated the prevailing law on plain error as follows:

As the [Sixth Circuit] has previously recognized, "prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *[United States v.] Carroll,* 26 F.3d [1380,] 1385 n. 6. In *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993),

the Supreme Court set forth three factors a defendant must prove to obtain relief under a plain error analysis. First, the defendant must show that there was an error. *Id.* at 732–33, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508. Error is defined as "[d]eviation from a legal rule ... unless the rule has been waived," and waiver is defined as the "'intentional relinquishment or abandonment of a known right.'" *Id.* at 733, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (*quoting Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Second, the defendant must show that the error was plain or obvious under current law. *Id.* at 734, 113 S.Ct. 1770. Finally, the defendant must establish that the plain error affected his substantial rights. This means that "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Id.* If these requirements are satisfied, then the court of appeals should exercise its discretion to remedy the error "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 736, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (quotation omitted). The Supreme Court and this court have subsequently clarified that the Olano test involves four steps. *See Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) ("[B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.") (quotations omitted); *United States v. Monus*, 128 F.3d 376, 386 (6th Cir.1997). *Carroll* provides, as noted

above, four specific factors to consider in evaluating whether a prosecutor's improper conduct or remarks warrant reversal.

*Id.* at 783–84. The Petitioner has not established the requisite elements, and has offered little in the way of argument in support of his contention that he is entitled to relief based upon prosecutorial misconduct. Consequently, none of the instances of alleged misconduct on the part of the prosecutor constituted plain error such that the Petitioner is entitled to relief..

Ground 13 is denied.

**Ground 14. THE PETITIONER'S RIGHTS TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PETITIONER'S CONVICTION OF A SPECIFICATION WHICH WAS MERELY A DUPLICATION OF AN ELEMENT OF THE PRINCIPAL OFFENSE.**

The United States Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) held as follows:

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *cf. Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909,

49 L.Ed.2d 859 (1976). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. *Id.* at 162–164, 96 S.Ct. 2909 (reviewing Georgia sentencing scheme); *Proffitt v. Florida*, 428 U.S. 242, 247–250, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (reviewing Florida sentencing scheme). By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. *Zant, supra*, 462 U.S., at 878, 103 S.Ct. 2733 ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty"). In *Zant v. Stephens, supra*, we upheld a sentence of death imposed pursuant to the Georgia capital sentencing statute, under which "the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty." *Id.* at 874, 103 S.Ct. 2733. We found no constitutional deficiency in that scheme because the aggravating circumstances did all that the Constitution requires.

The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), establishes this point.

*Id.* at 244–45, 108 S.Ct. 546.

Utilizing the framework of analysis set forth in *Lowenfield,* and for the same rea-

sons set forth therein, this Court finds R.C. § 2929.04 constitutional. Ground 14, therefore, is denied.

**Ground 15. THE TRIAL COURT ERRED IN CONDUCTING CERTAIN OF THE PROCEEDINGS WITHOUT THE PRESENCE OF THE PETITIONER IN VIOLATION OF THE PETITIONER'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION.**

The Petitioner argues that his constitutional rights were violated when the trial proceeded without his presence. The Petitioner contends that had he been present he could have objected to any erroneous part of the proceedings and would have had the opportunity to consult with his counsel. The Petitioner identifies specific instances during the trial when he was not present.

The first instance where the Petitioner asserts that his absence violated his constitutional rights was during the discussion of the number of preemptory challenges each side would be allocated. The record indicates the following discussion took place between counsel and the court, outside the jury's presence:

> THE COURT: * * * It is my understanding that the Defense waived the presence of Mr. Andre Jackson for purposes of this request to go on the record; is that a fair statement?
>
> MR. KELLEY (Defense counsel): Yes, your Honor.

(Tr. at 522.) The second instance Petitioner was not present the following exchange occurred:

> THE COURT: There is one other thing I want to put on the record. I assume you don't need him [Petitioner] here for the purposes of that which we have discussed?
>
> MR. KELLEY (defense counsel): No.
>
> THE COURT: If it comes to the point where you feel that you do, stop me and we will bring him in and advise him.

(Tr. at 525–6.) The following exchange occurred the next time Petitioner was not present:

> THE COURT: Let the record reflect that we are in chambers and that Mr. Jackson asked the Court if he could waive his presence and I said yes.

(Tr. at 672.) Petitioner points out three more occasions where he was not present, and on each occasion, a similar conversation took place concerning Petitioner's presence being waived. (Tr. at 886, 1805, 1832.)

 The Court has reviewed the transcript and notes that in each instance in which the Petitioner claims that his absence prejudiced him, he had waived his presence. Therefore, there is no basis in the record for the Petitioner's assertion that his absence from certain portions of the proceedings violated his due process rights. Accordingly, Ground 15 is denied.

**Ground 16. THE TRIAL COURT COMMITTED NUMEROUS ERRORS IN INSTRUCTING THE JURY IN THE VOIR DIRE PHASE OF THE PETITIONER'S CAPITAL MURDER TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner argues that the trial court committed numerous errors during

voir dire. This Court has considered all of the alleged errors individually and cumulatively and has also reviewed the transcript. The transcript does not reflect the allegations made by the Petitioner, and he does not cite to any specific portion of the transcript in support of his claims with which the Court should be concerned. Therefore, the Court concludes that, because the jury was properly instructed before their guilt-phase and penalty phase deliberations began, the alleged errors were harmless and the Petitioner did not suffer any prejudice. *See Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (*citing United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Accordingly, Ground 16 is denied.

Ground 19 will be considered next, as it also deals with errors allegedly committed by the trial court during voir dire.

**Ground 19. THE SERVICE OF BIASED JURORS SKEWED THE PETITIONER'S ENTIRE CAPITAL PROCEEDING IN FAVOR OF GUILT VERDICTS AND OF THE DEATH PENALTY IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner argues that several jurors were biased against him before ever hearing any evidence at trial. Specifically, the Petitioner alleges that, for various reasons, up to six jurors were biased against him. Additionally, the Petitioner asserts that the prosecutor exercised preemptory challenges to exclude jurors who felt strongly that the death penalty should only be reserved for a few. The record does not support either of these claims.

Recently, Senior United States District Judge Arthur S. Spiegel of the Southern District of Ohio, succinctly set forth the law governing allegations of juror bias. Judge Spiegel wrote as follows:

The United States Constitution guarantees a state criminal defendant a right to a fair trial by a panel of impartial jurors. *Wainwright v. Witt,* 469 U.S. 412, 418, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (noting that every state guarantees a criminal defendant a right to a jury trial and that this right encompasses the right to an impartial jury); *see also Tinsley v. Borg,* 895 F.2d 520, 523 (9th Cir.1990). Therefore, when a petitioner asks a federal court on habeas corpus review to examine his voir dire, the focus is on whether the decisions reached by the trial court during the voir dire prevented the empaneling of an impartial jury. *See Hill v. Brigano,* 199 F.3d 833, 844 (1999); *see also Wainwright,* 469 U.S. at 423, 105 S.Ct. 844.

The voir dire requires a trial judge to determine juror bias based on a prospective juror's demeanor, inflection, and responses to a particular flow of questioning. *Tinsley v. Borg,* 895 F.2d 520, 525 (9th Cir.1990); *see also McQueen v. Scroggy,* 99 F.3d 1302, 1321 (6th Cir.1996). Because the trial court's credibility decisions become "historical fact[s]", these decisions are subject to the presumption of correctness found in Title 28 U.S.C. § 2254(d), *Wainwright,* 469 U.S. at 429–30, 105 S.Ct. 844, and "may 'be overturned only for manifest error.'" *Hill,* 199 F.3d at 843 (*quoting Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847(1984) (*citing Irvin,* 366 U.S. at 723, 81 S.Ct. 1639)); *see also Dennis v. Mitchell,* 68 F.Supp.2d 863, 888 (N.D.Ohio 1999) (*discussing Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878)).

Accordingly, in examining the merits of Petitioner's Claim [ ], this Court must be "guided by the traditionally broad discretion afforded the trial judge in conducting voir dire." *Hill*, 199 F.3d at 843 (*citing Mu'Min v. Virginia*, 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *Ham v. South Carolina*, 409 U.S. 524, 528, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)); *Dennis*, 68 F.Supp.2d at 890. The burden of showing that "a juror was unable to set aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court" rests with Petitioner. *Hammer v. Bowlen*, 934 F.Supp. 911, 916 (M.D.Tenn.1996) (*citing Irvin*, 366 U.S. at 723–24, 81 S.Ct. 1639).

*Jamison v. Collins*, 100 F.Supp.2d 647, 699–700 (S.D.Ohio 2000). Furthermore, the Court explained that "[w]hen a trial court's decision to dismiss a prospective juror for cause based on the person's opinion of capital punishment is challenged, the standard is 'whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424, 105 S.Ct. 844 (*quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). However, the Petitioner is not required to prove a juror's bias with " 'unmistakable clarity.'" *Id.* (*citing Wainwright*, 469 U.S. at 424, 105 S.Ct. 844).

■ The Petitioner has not provided any evidence which demonstrates that any juror was biased against him and that the trial court empaneled a biased jury. Rather, a close reading of the voir dire shows that the Court, the prosecution, and defense counsel took great measure to insure

that the prospective jurors could be "fair and impartial" in considering the case presented to them. Trial courts are afforded broad discretion in conducting voir dire, and the trial judge in the Petitioner's case did not abuse that discretion. If anything, the transcript reflects that the trial judge was very concerned about delving into the minds of the jurors to determine whether they could perform their duty in accordance with the law of the State of Ohio. Furthermore, a "death qualified" jury—one that is comprised of jurors not opposed to the death penalty and willing to consider imposing it—is constitutional. *See Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 n. 21 (1968). Consequently, the Petitioner's claim that biased jurors affected the outcome of his trial is entirely unfounded and without merit. The sub-claims contained in Paragraphs 66, 67, and 68 are denied.

The Petitioner claims in Paragraph 69 that the prosecution exercised preemptory challenges to exclude jurors who had reservations about imposing the death penalty except in a small category of cases. The record reflects that the trial court permitted the excusal of prospective jurors who stated that they could not follow the instructions of law presented to them in considering whether to impose the death penalty. These individuals essentially stated that they could not impose the death penalty, in any circumstance, even if the prosecution met its burden of proof, and therefore were properly excused. Other prospective jurors were excused for reasons not stated on the record, and it cannot be inferred from the record that the prosecutor excused those jurors for improper purposes.[5] The Petitioner has

---

5. Ultimately the jury was composed of individuals with the following positions on the death penalty: five jurors expressed that they

had no position on the death penalty; one juror was personally against the death penalty; three jurors were personally for the death

not provided any evidence, and the Court has not found any in the record, which supports the Petitioner's Paragraph 69 claim. Accordingly, it shall be dismissed.

Finally, the general assertions made by the Petitioner in Paragraph 70 concerning the service of biased jurors are unsupported by the record.

Accordingly, Ground 19 is dismissed.

**Ground 18. THE TRIAL COURT DENIED THE PETITIONER HIS DUE PROCESS, EQUAL PROTECTION AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY FAILING TO PROVIDE HIM WITH AN EXPERT WHEN THIS SERVICE WAS REASONABLY NECESSARY TO ADEQUATELY PREPARE FOR TRIAL.**

The Petitioner contends that the trial court denied him his constitutional rights by failing to provide him with an expert when this service was reasonably necessary to adequately prepare for trial. The Petitioner filed a motion seeking funding for an expert with social and applied behavioral science expertise to assist counsel in jury selection. The Petitioner contends that, due to the trial court's denial of this motion, counsel was unable to intelligently exercise his preemptory challenges or challenge jurors for cause. The Petitioner further argues that individuals served on the Petitioner's jury who were predisposed to find him guilty and sentence him to death or who were not willing to listen to his defense or mitigation as a result of the trial court's denial of this motion.

In considering the Petitioner's contention, this Court looks to R.C. § 2929.024, which provides:

> If the court determines that the defendant is indigent and that investigation services, experts, or other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant, and shall order that payment of the fees and expenses for the necessary services be made in the same manner that payment for appointed counsel is made . . . .

The trial court, then, has the discretion to determine whether the Petitioner is in need of expert assistance. *See id.* In *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264, (1984), the Ohio Supreme Court determined that the following factors are relevant in considering whether the trial court abused its discretion in denying "reasonably necessary" funding requests for expert assistants: (1) the value of the expert assistance to the Petitioner's proper representation by counsel; and (2) the availability of other means to satisfy the same functions. *See id.* at 193, 473 N.E.2d 264.

The Fifth Circuit in *Moore v. Johnson,* 225 F.3d 495 (5th Cir.2000), discussed an indigent defendant's right to a jury selection expert using the framework set forth in *Ake, supra.* The court explained that after *Ake,* "a defendant cannot expect the state to provide him a most-sophisticated defense; rather, he is entitled to 'access the raw materials integral to the building of an effective defense.'" *Id.*

penalty; two jurors, whose individual voir dire is not part of the record submitted to this Court, are unaccounted for.

at 503 (*citing Ake*, 470 U.S. at 77, 105 S.Ct. 1087). Furthermore, "[m]ost of those raw materials come to the defendant in the form of his court-appointed lawyer—in his expert knowledge about how to negotiate the rules of court, how to mount an effective defense, and so forth." *Id.* The Fifth Circuit also persuasively reasoned that "jury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals. All competent lawyers are endowed with the 'raw materials' required to pick a jury fairly disposed toward doing substantive justice." *Id.* Ultimately, the court held that "a defendant does not lack 'an adequate opportunity to present [his] claims fairly' because he has been denied a jury consultant." *Id.* Consequently, for the foregoing reasons, the Petitioner's claim concerning the trial court's denial of a jury selection expert fails.

Therefore, Ground 18 is denied.

**Ground 20. THE ADMISSION OF HEARSAY EVIDENCE VIOLATED THE PETITIONER'S RIGHTS OF CONFRONTATION OF WITNESSES AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

The Petitioner claims that two witnesses were permitted to give hearsay testimony during the guilt phase of the trial in contravention of his right to confrontation.

 The Petitioner argues that witness, Beniyah Yearby ("Yearby"), was told by the victim that she and a person Yearby testified was the Petitioner had an altercation two days before the murder. The Petitioner's argument is not supported by the record. Yearby was present in the laundromat where Zak worked on June 23, 1987, when a man she subsequently identified as the Petitioner had an altercation with Zak. Yearby witnessed the entire incident between the Petitioner and Zak. Yearby did not testify, as the Petitioner asserts, as to statements make by Zak on June 23. Rather, she testified as to what she saw and heard at the laundromat that day. Yearby testified that someone entered the laundromat, approached the coin machine, and addressed Zak in a loud tone. Yearby only turned around when she heard a loud noise which she believed was the Petitioner hitting Zak, which was not the case. When Yearby turned around, she observed the individual, whom she subsequently identified as the Petitioner, for at least one minute. The record reveals that Yearby's testimony was offered to prove the fact that the Petitioner and Zak had an altercation of some kind prior to Zak's murder. The fact that an altercation occurred between the Petitioner and Zak was more important than what was said during that altercation, or what the altercation concerned. Moreover, any statements made by Zak to Yearby after the Petitioner left the premises concerning what had just transpired fall under Ohio R. Evid. 803(1) which excepts present sense impressions from the hearsay rule. Present sense impressions are statements describing or explaining an event made while perceiving the event or immediately thereafter unless the circumstances indicate untrustworthiness. Based on the foregoing, the Petitioner has not established a constitutional violation, and the sub-claim contained in Paragraph 72 is denied.

 The Petitioner additionally asserts that a police officer, Officer Pestak, testified that the apartment complex where the Petitioner lived did not provide laundry bags like those found in the Petitioner's apartment. This information was appar-

ently provided to the police officer by an employee at the Petitioner's apartment complex who was not called to testify at trial. This is hearsay which does not fall under any exception to the hearsay rule. Despite the trial court's error in allowing Officer Pestak's testimony, it is but harmless error as the Petitioner has not proven that actual prejudice resulted from its admission at trial. *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. Accordingly, the claim contained in Paragraph 73 is denied.

Therefore, Ground 20 is denied.

**Ground 22. THE PETITIONER WAS DENIED HIS RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE JURY WAS PERMITTED TO REVIEW A VICTIM IMPACT STATEMENT DURING THE GUILT PHASE.**

The Petitioner contends that his Eighth and Fourteenth Amendment rights were violated because the jury was permitted to review a victim impact statement during the guilt phase of the trial. The Petitioner contends that the prosecutor elicited testimony from several witnesses concerning the victim which was intended to invoke the jury's sympathy. The prosecutor also emphasized this testimony in its arguments to the jury. The Petitioner argues that admission of this victim impact evidence was prejudicial as it provided the jury with highly inflammatory and irrelevant evidence that merely served to distract them.

The United States Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no bar per se." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In *Payne*, the Court determined that there was nothing unfair about the jury hearing testimony regarding the loss experienced by the victim's family as a result of the murder during the penalty phase of the trial. *See id. See also Jones v. United States*, 527 U.S. 373, 395, 119 S.Ct. 2090, 2105, 144 L.Ed.2d 370 (1999). The Supreme Court reasoned, "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne*, 501 U.S. at 827, 111 S.Ct. 2597. Inclusion of such information is consistent with the goals of justice and fairness. *See id.*

██ The Sixth Circuit has also extended application of the Supreme Court's holding in *Payne* to the guilt phase of the trial. *See Byrd v. Collins*, 209 F.3d 486 (2000). A Petitioner may only prevail where the victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. 2597. In *Byrd*, the Sixth Circuit held that the videotaped interview of the victim with his family, as well as emotionally charged statements made by the prosecutor, do not constitute prejudicial victim impact evidence.[6] Thus, the Petitioner must show that the statements

---

6. In its opinion, the Sixth Circuit cites opinions from the Fourth, Fifth, and Seventh Circuits, all of which extended the Supreme Court's holding in *Payne* to the guilt phase of the trial. *See Id.* at 532; *Bennett v. Angelone*, 92 F.3d 1336 (4th Cir.1996); *Black v. Collins*, 962 F.2d 394 (5th Cir.1992); *Williams v. Chrans*, 945 F.2d 926 (7th Cir.1991). Each circuit found that the victim impact argument did not render the trial fundamentally unfair. *See Bennett*, 92 F.3d at 1348; *Black*, 962 F.2d at 408; *Williams*, 945 F.2d at 947.

elicited by the prosecutor during the guilt phase of the trial were so unduly prejudicial as to render the trial fundamentally unfair.

■ The record does not support the Petitioner's claim that his rights were violated when the prosecutor elicited victim impact evidence from several witnesses and used this evidence in his arguments to invoke the jury's sympathy during the guilt phase of the trial. The record indicates that the victim impact statements were relatively brief in comparison to the overwhelming amount of evidence presented at trial. In the opening argument, the prosecution dedicated nearly one full page out of 28 pages of transcript to the personal characteristics of the victim. (Tr. at 712–40.) The victim was described as being five foot one, 109 pounds, and 74 years old. (Tr. at 714.) She was also described as being "a creature of habit," meticulously clean, and running a "tight ship at the laundromat." (Tr. at 715.) The prosecutor even acknowledged that not everyone appreciated the way she ran the place. (Tr. at 715.) In its closing argument, the prosecution briefly repeated the same information regarding the victim's habits in less than one page out of 23 pages of transcript which contain the prosecutor's closing arguments. (Tr. at 1677–1700, 1680.) Additionally, when questioned whether a determination had been made regarding the victim's age, height, and weight, the coroner testified that the victim was 109 pounds, five feet one, and elderly and frail. (Tr. at 787.) Three of the State's witnesses briefly testified to the victim's habit of cleanliness. (Tr. at 841, 902, 982.) Thus, in comparison to the amount of evidence presented during the guilt phase, the prosecutor's comments and witnesses' testimonies about the victim were minimal. The Petitioner's trial counsel objected to

the prosecutors remarks or the testimony about the victim.

In addition, the trial judge also instructed the jury not to allow sympathy, bias, prejudice, or favoritism to affect their judgment. (Tr. at 1680, 1775.) Considering the instruction from the judge that the arguments, of course, were not evidence, the record does not demonstrate that the evidence or prosecutor's statements were so inflammatory as to deprive the Petitioner of a fundamentally fair proceeding such that his due process rights were violated. Consequently, Ground 22 is denied.

**Ground 23. THE PETITIONER WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PHASE OF HIS CASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner has asserted an extensive list of errors allegedly committed by his trial counsel. The Petitioner apparently did not raise these claims on direct appeal to the Ohio Supreme Court.

As an initial matter, the Petitioner asserts that his trial counsel failed to obtain "all necessary experts to assist in trial preparation." Further, during voir dire, the Petitioner alleges that his counsel failed to ensure that all proceedings were recorded; failed to file motions to suppress Petitioner's statement and eyewitness identification; failed to conduct voir dire according to professionally accepted standards in not requesting limiting instructions; failed to request sequestration of prospective jurors; failed to object to prosecutorial misconduct; failed to object to misstatements of law; failed to object to the word recommendation used over and

over again by the prosecutor and the judge; failed to object to the unlawful use of preemptory challenges; failed to develop a theory of the case during voir dire; failed to move for dismissal of certain jurors for cause.

The Petitioner further asserts that during the trial itself his counsel failed to object to inappropriate questions from the prosecutor; failed to request a continuance when it became necessary; failed to object to prejudicial hearsay; failed to investigate and argue the culpability of other suspects; failed to object to the State's characterizations of the victim; failed to appreciate the significance of evidentiary matters.

Finally, the Petitioner argues that during closing arguments his trial counsel failed to object when evidence was misstated; failed to object when the jury's sympathy was invoked and personal opinions were argued; failed to object when other acts evidence was argued and comments about the Petitioner's were made which included details of those offenses. The Petitioner also argues that defense counsel failed to request written jury instructions or to file requested jury instructions regarding unreliability of eyewitness testimony and other acts evidence.

Ineffective assistance of counsel claims are adjudicated under the standard set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland,* the Court held,

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the results unreliable.

*Id.* at 687, 104 S.Ct. 2052. The Court further explained that "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. Furthermore, the Court reasoned that to show prejudice, the Petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome of the case." *Id.* at 691–92, 693, 104 S.Ct. 2052. Rather, in the context of a death penalty case, the Petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052. A court which undertakes the prejudice inquiry "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696, 104 S.Ct. 2052.

 Courts presume that an attorney is competent, and the burden rests upon the defendant to show a constitutional violation. *See United States v. Pierce,* 62 F.3d 818, 833 (6th Cir.1995). A strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir.1994).

In determining whether counsel's conduct falls within the broad range of professionally acceptable conduct, courts will not view counsel's actions through "the distorting lens of hindsight." *Hendricks v. Calderon,* 70 F.3d 1032, 1036 (9th Cir.1995). Rather, under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices. *See id.* A habeas petitioner must also overcome the presumption that under the circumstances, the challenged action might be sound trial strategy. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Ultimately, the burden is on a defendant (or petitioner) to show that counsel's performance resulted in "an actual breakdown of the adversarial process" so as to deprive the defendant or petitioner of a fair trial. *See United States v. Cronic,* 466 U.S. 648, 657–58, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by a habeas petitioner as a result of the alleged deficiencies. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. Conversely, if the petitioner fails to establish prejudice, the court need not further analyze counsel's performance. *See, e.g., Fuller v. Roe,* 182 F.3d 699 (9th Cir.1999).

■■■ The Petitioner asserts that his trial counsel failed to obtain expert assistance in preparing his case for trial. The record shows that the Petitioner filed no less than four motions to request the appointment of a forensic expert, a handwriting expert, an investigator, and a mitigation expert. The trial court granted the Petitioner's motions for a handwriting expert and a mitigation expert, and apparently denied the other two motions. The Petitioner has not demonstrated that his trial counsel were deficient in their representation with respect to obtaining expert assistance in preparing for trial, nor has he shown that he was prejudiced because

he was denied a forensic expert and an investigator. Consequently, absent a showing of prejudice, the Petitioner's sub-claim concerning trial counsel's ineffectiveness in acquiring experts to assist in pretrial investigation and preparation for trial is denied.

Furthermore, the record does not support the Petitioner's claim that trial counsel failed to file motions to suppress his statement and eyewitness identification testimony. Trial counsel, in fact, filed a motion to suppress both the Petitioner's oral statement and the eyewitness identification testimony. (*See* Resp. Ex. 6 & 9.) Trial counsel also moved to suppress fingerprint evidence. (See Resp. Ex. 8.) Because the record does not support the Petitioner's contention with respect to trial counsel's failure to file appropriate motions to suppress, the sub-claim is denied.

The Petitioner also has asserted a number of other claims for which, assuming that they are true, he has not shown that he suffered prejudice. The claims are as follows: failure to ensure that all proceedings were recorded; failure to request sequestration of prospective jurors; failure to object to unidentified misstatements of law; failure to object to use of the word "recommendation" by the prosecutor and judge; failure to request a continuance at some unspecified point during the trial; failure to object to the State's characterizations of the victim; failure to appreciate the significance of evidentiary matters; failure to object to misstatements of what the evidence was. The Petitioner has not provided any evidence or argument in support of any of these sub-claims. Because the Petitioner has failed to establish that any of the above-alleged deficiencies prejudiced him, each sub-claim is denied.

The Petitioner has made additional claims in Ground 23 concerning his counsel's failure to object to various occurrences during trial. First, the Petitioner

asserts that his trial counsel was deficient in the manner in which they conducted voir dire. Specifically, the Petitioner has asserted that his trial counsel failed to request appropriate limiting instructions, failed to object to the allegedly unlawful use of preemptory challenges by the prosecution, failed to strike certain unidentified jurors for cause, and failed to develop a theory of the case during voir dire. This Court has thoroughly reviewed the entire voir dire process in connection with the analysis set forth in Ground 19 above. The Court has not identified any deficient conduct on the part of the Petitioner's trial counsel during voir dire with respect to any of the claims asserted by the Petitioner. Moreover, even assuming deficient conduct by the Petitioner's trial counsel, he has not established that he was prejudiced by such conduct. Accordingly, the Petitioner's sub-claim concerning ineffective assistance of counsel during voir dire is denied.

Next, the Plaintiff argues that his trial counsel failed to object to instances of prosecutorial misconduct during the trial, and also failed to object to inappropriate questions by the prosecutor. This Court, in Ground 13, found that any alleged misconduct committed by the prosecutor during the trial did not result in prejudice to the Petitioner. Thus, trial counsel's failure to object to the alleged misconduct was inconsequential and did not prejudice the Petitioner. The Petitioner's sub-claim, therefore, is denied.

Third, the Petitioner argues that his counsel failed to object to prejudicial hearsay during the course of the trial. In Ground 20, this Court discussed the erroneous admission of hearsay testimony by the trial court and concluded that it was harmless error which did not prejudice the Petitioner. Therefore, trial counsel's failure to object to hearsay testimony and admitted by the trial court did not preju-

dice the Petitioner. Consequently, this sub-claim is denied.

■ Fourth, the Petitioner argues that his trial counsel failed to investigate and argue the culpability of other suspects. In Ground 1, the Petitioner alleged that the prosecution failed to disclose evidence of other suspects investigated in connection with the murder of Emily Zak. The Court found that the prosecutor's failure to disclose investigatory leads regarded two other men named Pete Johnson was not a *Brady* violation. This Court reasoned that the disclosure of these investigatory leads would not have changed the outcome of the case, particularly considering the totality of the evidence presented during trial which indicated the Petitioner's guilt. Now, the Petitioner argues that his trial counsel was deficient in their representation because they failed to investigate and argue the culpability of other suspects. This Court concludes that even if trial counsel was deficient in their investigation of other suspects and failed to present evidence of the culpability of other suspects, it did not result in prejudice to the Petitioner considering the overwhelming evidence of the Petitioner's guilt which has been thoroughly discussed *supra.* Accordingly, this sub-claim is denied.

■ Fifth, the Petitioner claims that his trial counsel was deficient because they failed to object to the prosecutor's comments concerning "other acts" evidence during closing arguments. This Court, in Ground 13, found that the other acts evidence was properly admitted to impeach a defense witness was properly admitted. Because it was properly admitted, the prosecutor was free to comment upon it during his closing arguments. Even if the Petitioner's trial counsel was deficient in failing to object, the Petitioner has not demonstrated that prejudice resulted from this failure. Consequently, this sub-claim is denied.

 Finally, the Petitioner argues that his trial counsel failed to request written jury instructions concerning the unreliability of eyewitness identification. The Court has dealt with this issue in its discussion of Paragraph 77, Ground 21. The Court found that the trial court's failure to specially instruct the jury on the potential problems with eyewitness identification was not erroneous, and that the Petitioner had not identified any circumstances which would necessitate such an instruction under Ohio law. Therefore, the failure of the Petitioner's trial counsel to request an eyewitness identification instruction, which is distinct from the general instruction on the jury's role as judge of the credibility of witnesses, was not deficient. Even if trial counsel's failure to make such a request was deficient, the Petitioner has not demonstrated that their failure prejudiced him. Therefore, this sub-claim is denied.

Based upon the foregoing analysis, the Petitioner has failed to demonstrate that his trial counsel's conduct was deficient, and that the alleged conduct resulted in prejudice to him. As such, the Plaintiff has not established a constitutional violation, and Ground 23 is denied in its entirety.

## C. Sentencing Issues

**Ground 17. THE PRECLUSION OF MITIGATION EVIDENCE AT THE PETITIONER'S PENALTY HEARING VIOLATED HIS RIGHTS TO A RELIABLE SENTENCING DETERMINATION BY AN INFORMED JURY AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner has asserted three separate claims in this Ground which relate to the use of residual doubt during the penalty phase of his trial. The Petitioner initially asserts that the trial court erred when it failed to instruct the jury on residual doubt during the penalty phase of his trial. The Supreme Court of Ohio ruled on this issue during the Petitioner's direct appeal. The court held as follows:

Jackson correctly argues that the trial jury may consider residual doubt in deciding a death penalty case. *State v. Gillard*, 40 Ohio St.3d 226, 234, 533 N.E.2d 272, 281 (1988); *State v. Buell*, 22 Ohio St.3d 124, 142, 22 OBR 203, 218–219, 489 N.E.2d 795, 811 (1986). However, Jackson waived any instructional deficiency by not requesting such an instruction or objecting to its absence. Failing to object to a jury instruction waives any error "unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332 (1983), syllabus. *See also*, Crim.R. 52(B); *State v. Long, supra; State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364 (1977), paragraph one of the syllabus. Jackson's failure to raise the issue at the court of appeals also waived all but plain error. *See State v. Williams, supra*, paragraph two of the syllabus.

Here, no miscarriage of justice, plain error, or material prejudice resulted from the trial judge's failure to instruct on residual doubt. Even with such an instruction, the outcome of the trial would not have been clearly different. *State v. Underwood, supra.* The jury could readily reconcile Myrieckes' testimony with Jackson's guilt. [ ] Moreover, in an unsworn mitigation statement, Jackson continued to profess innocence; hence the possible significance of Myrieckes' testimony was

not lost on the jury. Instead, the jury by their recommendation of death continued to reject Jackson's alibi defense and pleas of innocence.

*Jackson,* 565 N.E.2d at 561–62.

 In *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the United States Supreme Court discussed residual doubt as a factor during the penalty phase of a capital case. The Court's discussion is as follows:

> At the outset, we note that this Court has never held that a capital defendant has a constitutional right to an instruction [on residual doubt]. Petitioner suggests that our discussion of the "residual doubt" question in *Lockhart v. McCree,* 476 U.S. 162, 180–82, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), supports his position that he has such an entitlement. But all that this aspect of the *Lockhart* opinion stands for is the simple truism that where "States are willing to go to allow defendants to capitalize on 'residual doubts,'" such doubts will inure to the defendant's benefit. *Lockhart, supra,* at 181, 106 S.Ct. 1758. *Lockhart* did not endorse capital sentencing schemes which permit such use of "residual doubts," let alone suggest that capital defendants have a right to demand jury consideration of "residual doubts" in the sentencing phase. Indeed, the *Lockhart* dissent recognized that there have been only a "few times in which any legitimacy has been given" to the notion that a convicted capital defendant has a right to argue his innocence during the sentencing phase. 476 U.S. at 205–206, 106 S.Ct. 1758 (Marshall, J., dissenting). The dissent also noted that this Court has not struck down the practice in some States of prohibiting the consideration of "residual doubts" during the punishment trial. *Id.*

Our edict that, in a capital case, " 'the sentencer ... [may] not be precluded from considering, as a mitigating factor, any aspect of the circumstances of the offense,' " *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (*quoting Lockett,* 438 U.S. at 604, 98 S.Ct. 2954), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

*Id.* at 173–74, 108 S.Ct. 2320. (Emphasis added.) Moreover, the Court found that although the petitioner did not receive an instruction on residual doubt, the trial court did nothing to impair the petitioner's ability to raise the issue during the penalty phase of the trial. *See id.* Based upon the Court's opinion in *Franklin,* it is clear that the Petitioner in the case *sub judice* did not have a constitutional right to an instruction on residual doubt during the penalty phase of his trial. Accordingly, the Petitioner is not entitled to habeas relief on this sub-claim.

 The Petitioner also argues that defense counsel was deficient in explaining to the jury that residual doubt could be weighed as a mitigating factor. The Ohio Supreme Court found that "[at] the sentencing hearing, Jackson presented little evidence and relied principally upon residual doubt." 565 N.E.2d at 562. To this end, the Petitioner presented the testimony of his girlfriend Carla Elliot, and a young witness, Terence Myrieckes, who testified that he saw another man leaving the laundromat with a white duffel bag, that the cash register was not in its normal

place, and that Zak was standing near the bathroom door. The Petitioner also gave an unsworn statement during the penalty phase. Further, the Petitioner's trial counsel attempted to summarize other mitigating factors for the jury. Trial counsel made the following statement:

The State has proved that Mrs. Zak met her death in the course of an aggravated robbery. You already said that.

Your determination now must be whether or not that aggravating circumstance outweighs a mitigating factor or mitigating factors. I agree with the Prosecutor when he says—I think he said, anyway, that only two possible factors of mitigation have been presented here.

One is the youth of Andre Jackson, and two is the [sic] any other relevant mitigating factors. In the jury instructions which you will be given, those are number four and number seven.

First of all, let's talk about youth. Andre is 22 years old. Is that a mitigating factor in and of itself which outweighs the aggravating circumstance, that is, the killing and the robbery? It's only my opinion. You make the decision, but I myself would say by itself, no, it is not. I have no quarrel with that statement, but what we are saying to you and what has been presented to you is basically this.

Andre, from the day he became involved in this investigation, until today, has maintained that he is not responsible for Mrs. Zak's death. Through your deliberations, through his interview by the psychiatrist, through his interview by the person from the Probation Department after the verdict, he maintains he his innocent. He told here that he was innocent. He continues to maintain that he is innocent.

Terence Myrieckes was brought in by us. We learned of him only on Sunday. Now you might say how convenient that is. Yes, but the police department—I'm not saying Captain Newkirk, per se, I'm saying the police department knew about him long ago. We did not have that information. We could not present that to you before.

**Doesn't that information from Terrence Myrieckes add something to your consideration? Ladies and gentlemen, your verdict was that the State proved beyond a reasonable doubt that Andre Jackson did these things. As I said earlier, I'm sure you arrived at that verdict honestly, doing your duty.**

**Yet that verdict was a verdict beyond a reasonable doubt. It was not beyond all doubt. You didn't have the benefit of Terrence Myrieckes' testimony.**

**You must decide whether to recommend the death penalty. Death, as I'm sure the Prosecution may argue about Mrs. Zak's death, is beyond all doubt. If by chance, and something more than chance, you have made an honest mistake, the death penalty is uncorrectable. That cannot be corrected.**

The unanswered questions that Terence Myrieckes' testimony presents and suggests may be that which is mitigation. You have to determine that. Does that chance, that possibility, that probability raise to the level of 50 percent? When the judge charges you, you may understand that statement more than 50 percent. Does it outweigh the aggravating circumstance?

Ladies and gentlemen, if the Prosecution talks about the horrible death Mrs. Zak suffered and so on, I can understand that, but the only aggravating cir-

cumstance is the aggravated robbery and the surrounding circumstances.

Andre Jackson says to you he did not do this. You have determined that the evidence says otherwise. If you turned him completely off, considering what he says to you, if you turned off everything that I say to you and Mr. Kelley says to you then you are going to recommend death.

(Tr. at 1936–1939.) Although trial counsel never used "residual doubt" as a term of art in his closing, he presented a compelling argument to the jury that sufficient doubt existed with respect to whether his client committed the crime that the death penalty should not be imposed. Consequently, this Court finds that trial counsel was not deficient in arguing residual doubt during his closing statement, and that the Petitioner did not suffer prejudice as a result of his counsel's performance according to the standards set forth in *Strickland, supra,* and its progeny. The Petitioner, therefore, is not entitled to relief upon this sub-claim.

Additionally, the Petitioner has asserted that the prosecutor's comments during the penalty phase prejudiced him. The Court has reviewed the transcript and, without the benefit of any argument or analysis from the Petitioner, concludes that the Ohio Supreme Court did not violate 28 U.S.C. § 2254(d)(1) in reaching its decision rejecting the Petitioner's claim concerning the prosecutor's sentencing comments.

Finally, the Petitioner claims that the cumulative effect of the discussed in the immediately preceding paragraphs, taken together with the prosecutor's comments concerning the available mitigation evidence, resulted in a violation of his constitutional rights as guaranteed by the Eighth and Fourteenth Amendments. Even taken cumulatively, the alleged errors asserted by the Petitioner in Ground 17 do not warrant relief, and the Ground is therefore denied in its entirety.

As such, Ground 17 is denied.

**Ground 24. ERRONEOUS JURY INSTRUCTIONS AT THE PENALTY PHASE VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS AND A FAIR AND RELIABLE DETERMINATION OF THE APPROPRIATE PENALTY AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petitioner has raised several claims with respect to the jury instructions given by the trial court during the penalty phase of the trial. Each will be discussed in turn. The Court has reviewed the sentencing instructions given by the trial court at pages 1960 through 1979 of the transcript.

**a. Paragraph 93. The trial court erred in instructing the jury on all the available mitigating factors. Paragraph 95. The trial court improperly defined "mitigating factor."**

In *Jamison v. Collins, supra,* persuasively discussed the effect of instructing capital juries on all of the statutory mitigating factors, when only several may apply to a particular defendant. The instructions given by the trial court in *Jamison* are substantively similar to the instructions given in the case sub judice. The court explained as follows:

Ohio Revised Code §§ 2929.03 and 2929.04 guide the discretion of the trier of fact by limiting the mitigating factors a trier of fact may consider to support the imposition of the death penalty.

The trial court gave the following definition of mitigating factors:

> Mitigating factors are factors that, while they do not justify or excuse the crime of aggravated murder, *nevertheless may be considered by you as extenuating, lessening, weakening, excusing to some extent or reducing the degree of the defendant's culpability.*

The Ohio Revised Code enumerates the mitigating factors, some of which may not apply in this matter. These factors include but are not limited to the following: one, the nature and circumstances of the offense; two, the history, character and background of the offender; three, whether the victim of the offense induced or facilitated it; four, whether it is unlikely the offense would have been committed but for the fact the defendant was under duress, coercion or strong provocation; five, whether at the time of committing the offense the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; six, the youth of the offender; seven, the offender's lack of a significant history of prior criminal convictions and delinquency adjudications; eight, if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim; nine, any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(Tr. 2762–63 (emphasis added)).

Regarding the trial court's definition of mitigating factors, Petitioner argues that the trial court incorrectly intimated to the jury that mitigating factors must excuse or reduce blame in order to support a life sentence. Petitioner further asserts that the trial court's definition of a mitigating factor denied Petitioner the benefit of much of his mitigation evidence regarding his childhood.

In addition, Petitioner contends that the trial court erred in charging the jury on all of the mitigating factors listed in Ohio Revised Code § 2929.04 (see Tr. at 2763–64). By instructing the jury on all of the factors, Petitioner argues, the trial court changed the focus of the mitigation hearing from a qualitative analysis of the evidence to a quantitative analysis of the number of mitigating factors presented and impermissibly converted the mitigating factors into aggravating circumstances. [ ]

Having reviewed Petitioner's arguments concerning this instruction, the Court finds them to be without merit. Taken in context, the trial court's instructions do not create a reasonable likelihood that the jurors understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by Petitioner during the penalty phase. *See State v. DePew*, 38 Ohio St.3d 275, 289–90, 528 N.E.2d 542, 558 (1988) (finding no prejudicial error where the trial court read all the statutory mitigating factors to the jury but did not comment on the factors actually presented by the defendant). [ ] The Court further notes that the Supreme Court in Buchanan observed that "we have never ... held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id.*, 522 U.S. at 276, 118 S.Ct. 757.

*Id.* at 758–759 (emphasis original).

For the reasons set forth above, the Petitioner's sub-claims contained in Paragraph 93 and 95 are denied.

**b. Paragraph 94. The trial court improperly instructed the jury on reasonable doubt during the penalty phase.**

Contrary to the Petitioner's assertion, the trial court instructed the jury that the standard they were to use in determining whether the aggravating circumstance outweighed the mitigating circumstances was beyond a reasonable doubt. Furthermore, the Petitioner has failed to make any specific argument in support of this sub-claim, and the Court cannot divine from the single sentence contained in Paragraph 94 what impropriety existed in the trial court's instruction on reasonable doubt. However, the Court has reviewed the definition of reasonable doubt given to the jury during penalty phase instructions, and concludes that the trial court did not provide a definition which would influence the jury to impose the death penalty. *See generally Jamison v. Collins* 100 F.Supp.2d at 757. Therefore, because the Petitioner has not established a due process violation, the sub-claim contained in Paragraph 94 is denied.

**c. Paragraph 96. The Court repeatedly instructed the jury that its penalty determination was a non-binding recommendation in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).**

It is well-settled that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). *See also Jackson,* 565 N.E.2d at 561.

■ The trial judge instructed the jury in the Petitioner's case that their determination with respect to imposition of the death penalty was a recommendation. Under Ohio law, "the trial jury shall recommend to the court that the sentence of death be imposed on the offender." R.C. § 2929.03(D)(2). Therefore, when the

judge instructed the jury as stated above, he did not misstate Ohio law, and thus did not violate *Caldwell.* Accordingly, in affirming the instructions given by the trial court with respect to the role of the jury in recommending a sentence, the Ohio Supreme Court did not reach a conclusion that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Accordingly, the Petitioner's sub-claim contained in Paragraph 96 of Ground 24 is denied.

**d. Paragraph 97. The trial court failed to give an instruction that a life verdict was mandatory if the aggravation did not outweigh the mitigation.**

This sub-claim is without basis in the record. The trial court instructed the jury that if they concluded that the State did not prove that the aggravating circumstances outweighed the mitigating factors, that they were to choose between two life sentences to impose upon the Petitioner. (*See* Tr. at 1970–71.)

Accordingly, the Petitioner's sub-claim is denied.

**e. Paragraph 98. The trial court instructed the jury not to consider sympathy.**

This matter was resolved by the United States Supreme Court in *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). The Court held:

An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than

for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 543, 107 S.Ct. 837 (*quoting Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)). *See also Saffle v. Parks*, 494 U.S. 484, 493, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) ("Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." (Citing cases)).

█ Based on the foregoing Supreme Court precedent, the Petitioner cannot establish that the "no sympathy" instruction the trial judge gave to the jury during the penalty phase violated his due process rights. Accordingly, the Petitioner's sub-claim contained in Paragraph 98 is denied.

**f. Paragraph 99. The trial court failed to instruct the jury that residual doubt about the Petitioner's guilt could be weighed.**

This issue was discussed at length in the Court's analysis of Ground 17, *supra.* For the reasons set forth in that portion of the Court's Opinion, the sub-claim contained in Paragraph 99 is denied.

**h. Paragraph 100. The trial court failed to instruct on what course of action to take if they became deadlocked during the penalty phase deliberations.**

Under Ohio law, juries are given a special charge if they become deadlocked *dur-ing guilt phase deliberations* of a trial. The Ohio Supreme Court has yet to reach the question whether the same charge is applicable during the penalty phase of a capital case *before* the jury begins deliberating. *See State v. Dennis*, 79 Ohio St.3d 421, 683 N.E.2d 1096, 1107 (1997); *see also State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989).

█ Nonetheless, after reviewing Ohio case law, the Court did not find any example of a case where a trial court instructed a jury on how to proceed if deadlocked before that circumstance arose. To instruct a jury before they became deadlocked would be premature and would lessen the impact which the charge was designed to have upon the jurors. Therefore, the Court finds that the trial court did not err in not instructing the jury on what to do if they became deadlocked. Even if the trial court's failure to instruct prior to the jury deadlocking can be considered error, the Court concludes that it was harmless, and that the Petitioner did not suffer actual prejudice as a result. *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. As such, no prejudice accrued to the Petitioner.

Consequently, the sub-claim contained in Paragraph 100 is denied.

**Ground 25. THE ADMISSION INTO EVIDENCE OF THE PETITIONER'S STATEMENTS TO THE COURT PROBATION DEPARTMENT VIOLATED THE PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Ohio Supreme Court considered the Petitioner's claim with respect to the ad-

mission of the probation report prepared in connection with the penalty phase of his trial. The court held as follows:

An accused who asks for a presentence investigation cannot complain of its submission to the jury. *State v. Esparza*, 39 Ohio St.3d 8, 10, 529 N.E.2d 192, 195 (1988). Accurate information on pending charges can be included in a presentence investigation. *State v. Greer*, 39 Ohio St.3d 236, 253, 530 N.E.2d 382, 402 (1988). Arrests are a part of an accused's social history and are properly included in a presentence investigation. *State v. Hutton*, 53 Ohio St.3d 36, 559 N.E.2d 432 (1990), paragraph one of the syllabus; *State v. Cooey*, 46 Ohio St.3d 20, 35, 544 N.E.2d 895, 914 (1989). *See also, State v. Greer*, *supra*, paragraph four of the syllabus.

565 N.E.2d at 561.

The Petitioner asserts that his Fifth Amendment rights were violated by the disclosure of the contents of the pre-sentence investigation report to the jury. The Petitioner cites *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in support of his position. However, *Estelle* is distinguishable from the case *sub judice*. The Court in Estelle held that "Any effort by the State to *compel* [the petitioner] to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment." *Id.* at 463, 101 S.Ct. 1866. (Emphasis added.) This extends to statements made by capital defendants in the course of pre-sentence investigations which the State conducts in connection with sentencing proceedings.

There is nothing in the record to suggest that the Petitioner was compelled to submit to a pre-sentence investigation and psychiatric evaluation. Rather, the record shows that the Petitioner's counsel requested a pre-sentence investigation report prior to trial, which was supplemented after the jury returned its guilty verdict. The Petitioner's trial counsel also requested a psychiatric evaluation for the purposes of mitigation. The Court cannot but conclude that the Petitioner voluntarily chose to submit to both the pre-sentence investigation and the psychiatric evaluation in an effort to aid his presentation of mitigation evidence during the penalty phase of the trial. This is especially the case considering that the statements made by the Petitioner to the pre-sentence investigator and the psychiatrist concerning his innocence were utilized by his counsel when they argued residual doubt to the jury during closing arguments. Consequently, the Petitioner's statements to the pre-sentence investigator and the psychiatrist were admissible as part of the reports submitted to the Court.

■ Accordingly, this Court concludes that the Ohio Supreme Court's decision with respect to the admission of information contained in the Petitioner's pre-sentence investigation report was not "contrary to, or involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

■ The Petitioner has also claimed that the trial court committed constitutional error in permitting the introduction of his prior criminal record during the penalty phase. However, "nothing in the federal Constitution bars the introduction of a defendant's prior criminal record, which is highly relevant to his individual background and character." *Barclay v. Florida*, 463 U.S. 939, 970, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (Stevens, J. concurring). In the case *sub judice*, the prosecutor introduced the Defendant's prior record while impeaching a defense character witness, Carla Elliott, on cross-examination. Elliott testified that the Petitioner was a "sweet, loving person who never

abused her or anyone else." *Jackson*, 565 N.E.2d at 562. The prosecutor then related the extent of the Petitioner's prior violent crimes, particularly against women. Once the door to the Petitioner's character was opened by his trial counsel, the prosecutor was entitled to impeach the mitigation witness using the Petitioner's criminal record. Therefore, the Petitioner's claim concerning introduction of his prior criminal record during the penalty phase is without merit.

Ground 25 is denied.

**Ground 26. THE PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE PROPER PURPOSES FOR WHICH THE JURY MIGHT CONSIDER THE EXCULPATORY EVIDENCE.**

This issue was resolved in the Court's discussion of Ground 17. Accordingly, for the reasons set forth in Ground 17 of this Opinion, the Petitioner's claim in Ground 26 is denied.

**Ground 27. THE PROSECUTOR'S IMPROPER COMMENTS ON THE FACT THAT THE PETITIONER'S MITIGATION STATEMENT WAS UNSWORN DEPRIVED THE PETITIONER OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Grounds 27 and 29 contain claims based on the sentencing phase arguments made by the prosecutor. Because the grounds for relief assert claims arising from the same set of facts, the Court will consider them together.

**Ground 29. THE PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BECAUSE MISCONDUCT BY THE COUNTY PROSECUTOR AT THE PENALTY PHASE OF THE PETITIONER'S CAPITAL TRIAL DEPRIVED HIM OF HIS RIGHTS.**

The Petitioner argues that prosecutor's comments concerning the unsworn mitigation statement prejudiced him. The Petitioner contends that the prosecutor encouraged the jury to penalize him for invoking his right to make an unsworn statement. In addition, the Petitioner asserts the jury was encouraged to ignore the issue of whether the aggravating circumstance outweighed the mitigating factor.

The Ohio Supreme Court considered this ground for relief in the Petitioner's direct appeal. The court stated:

> Jackson asserts that the prosecutor, by remarks in argument, prejudiced Jackson's fair trial rights. The state denies error or prejudice and argues that Jackson failed to preserve error by not objecting. *See State v. DeNicola*, 163 Ohio St. 140, 56 O.O. 185, 126 N.E.2d 62 (1955), paragraph three of the syllabus.
>
> We find no manifest miscarriage of justice under the plain error rule. *See*

Crim.R. 52(B); *State v. Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804 (1978), paragraph three of the syllabus. In argument, the prosecutor did improperly refer to aggravating "circumstances" although only one aggravating circumstance existed. He said he was irked by Jackson's lack of compassion and remorse. The prosecutor also asserted that the nature and circumstances of the offense were "what really warrants * * * the death penalty," but this arguably only explained why they were not mitigating. Moreover, the trial judge correctly instructed the jury on the aggravating circumstance and that only one existed. *See State v. Johnson,* 46 Ohio St.3d 96, 103, 545 N.E.2d 636, 643 (1989).

According to the prosecutor, Jackson lacked courage to admit guilt, and made an unsworn statement, thereby avoiding cross-examination. The prosecutor's comment did extend beyond the guidelines for comment on unsworn statements in *State v. DePew,* supra, paragraph two of the syllabus. The prosecutor also said defense counsel attempted to "throw a monkey wrench or red herring" into the proceedings by transferring guilt to the jury, and was "mealy-mouthing." Although unprofessional, these comments were scarcely crucial.

Moreover, reversal cannot be premised on every intemperate remark by counsel. *State v. Maurer, supra,* 15 Ohio St.3d at 267, 15 OBR at 403, 473 N.E.2d at 793. Some latitude is granted to both parties in closing argument. *State v. Byrd,* 32 Ohio St.3d 79, 82, 512 N.E.2d 611, 616 (1987). Viewed in its entirety, the closing argument did not deny Jackson a fair trial.

565 N.E.2d at 560–61.

■ In *State v. DePew,* 38 Ohio St.3d 275, 528 N.E.2d 542 (1988), the Ohio Supreme Court determined that where a defendant makes an unsworn statement during the penalty phase of a capital case, the prosecution may comment on such statement but his comments must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to all other witness testimony. The Petitioner contends that the prosecutor's comments exceeded the limit set out in *DePew.*

■ The Sixth Circuit Court of Appeals has determined that a prosecutor may point out that an unsworn statement by an accused was not made under oath and not subject to cross-examination. *See Byrd v. Collins,* 209 F.3d at 533. A prosecutor's direct reference to a criminal defendant's failure to otherwise testify is a violation of the defendant's Fifth Amendment privilege against self-incrimination. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Indirect references on the failure to testify may also violate the Fifth Amendment privilege. In such a case, a reviewing court must look to all the surrounding circumstances when determining whether a Constitutional violation occurred. *Butler v. Rose,* 686 F.2d 1163, 1170 (6th Cir.1982). The court should consider whether the comments "manifestly intended" to reflect the accused's silence or are of such a character that the jury would "naturally and necessarily" take them as such; whether the remarks were isolated or extensive; whether evidence of guilt was otherwise overwhelming; and whether curative instructions were given, when they were given, and what they were. *See United States v. Moore,* 917 F.2d 215, 225 (6th Cir.1990).

Ultimately, the question is whether the Petitioner's due process rights were violated. *See Darden v. Wainwright,* 477 U.S.

168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Relief will not be granted unless "the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997). To constitute denial of due process, the misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Pritchett*, 117 F.3d at 964. *See also Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir.1993), *cert. denied*, 510 U.S. 1201, 114 S.Ct. 1317, 127 L.Ed.2d 666 (When prosecutorial misconduct "rises to the level of depriving the defendant of fundamental fairness in the trial process, the claim is remediable on a petition for habeas corpus relief.").

■ The prosecutor's comments did not violate the Petitioner's due process rights. The prosecutor's comments occurred in an isolated incident and they did not have a tendency to mislead the jury or prejudice Petitioner. Although the prosecutor mis-spoke and stated that "aggravating circumstances" existed, when only one aggravating circumstance had been presented, the trial court gave curative instructions. Furthermore, the prosecutor's comments did not directly or indirectly refer to the Petitioner's failure to testify such that his Fifth Amendment right against self-incrimination was violated. The comments were not manifestly intended to reflect Petitioner's silence nor were they of such character that the jury would naturally and necessarily take them as such. The prosecutor merely indicated he was upset that Petitioner lacked any remorse. This comment does not reflect on Petitioner's right to remain silent.

The arguments raised by Petitioner are identical to those he raised on direct review to the Supreme Court of Ohio, and the Petitioner has failed to show that that

court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. § 2254(d)(1). Accordingly, Ground 27 is denied.

**Ground 28. THE TRIAL COURT DENIED THE PETITIONER HIS DUE PROCESS, EQUAL PROTECTION AND EFFECTIVE ASSISTANCE OF COUNSEL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY FAILING TO PROVIDE HIM WITH AN INDEPENDENT PSYCHOLOGIST WHEN THIS SERVICE WAS REASONABLY NECESSARY TO ADEQUATELY PREPARE FOR AND PRESENT HIS CASE.**

■ The Petitioner asserts that his trial counsel should have obtained an independent psychological evaluation for him prior to the sentencing phase of his trial. R.C. § 2929.024 authorizes counsel for indigent defendants to obtain experts "reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing." Prior to trial, a psychological examination of the petitioner disclosed that he did not suffer from any mental disease or defect. Trial counsel knew this when they decided not to obtain an independent psychological examination prior to the sentencing phase of the trial. Therefore, it is reasonable to conclude that trial counsel did not request an independent psychological evaluation prior to sentencing because they knew they could not argue mental disease or defect as mitigating factors. Their decision to forego a futile psychological evaluation was sound

strategy supported by adequate investigation. *See Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir.2000); *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. Consequently, the Petitioner has failed to demonstrate that the decision of his trial counsel to forego an independent psychological evaluation prior to the sentencing phase of the trial resulted in prejudice to him under the *Strickland* standard discussed at length *supra.* As such, there is no constitutional violation and the Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim contained in Paragraphs 111 & 114.

Additionally, the Petitioner has not presented any evidence or argument with respect to his claim that the psychological evaluation conducted by the court-appointed psychologist was deficient. Therefore, the Petitioner's sub-claim contained in Paragraph 112 is denied..

The Petitioner also claims that the trial court deprived him of his due process rights by denying him access to a forensic expert and an investigator. The Petitioner has failed to demonstrate that fundamental unfairness resulted from the trial court's denial of his request for a forensic expert and an investigator such that his due process right were violated. Therefore, the sub-claim contained in Paragraph 113 is denied.

Finally, in his Traverse, the Petitioner briefly asserts that no mitigation evidence was gathered by his counsel for presentation during sentencing. The record shows that the trial court appointed a mitigation expert to assist the Petitioner in preparing for the sentencing phase. However, little mitigation evidence was presented by the Petitioner during the sentencing phase. In the absence of further argument by the Petitioner, the Court cannot conclude based on the record that the Petitioner's due process rights were violated.

For the foregoing reasons, Ground 28 is dismissed in its entirety.

**Ground 30. THE PETITIONER WAS DEPRIVED OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE STATE OF OHIO FAILED TO PROVE THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGHED THE MITIGATING FACTORS IN HIS CASE.**

The Ohio Supreme Court considered this argument in Section XV of its opinion in the Petitioner's case. The court stated:

At the sentencing hearing, Jackson presented little evidence and relied principally upon residual doubt. His girlfriend, Carla Elliott, testified that he was a sweet, loving person who never abused her or anyone else. Yet Carla's opinion never faltered when she heard Jackson previously had assaulted four women. Myrieckes' testimony could be reconciled with Jackson's guilt.

In an unsworn statement, Jackson said little about his background. Although he continued to assert his innocence, Jackson stated that he was not angry with the jury. He said he hoped and prayed the police ultimately would find the persons responsible for this crime. He did object to Newkirk's testimony on the ground that he never told Newkirk the things that Newkirk said he had. Jackson said he felt sorry for the victim, her family, and his own family, including Carla, who was going to have his baby. He said he would do the best he could in prison.

The presentence investigation revealed Jackson, a high school graduate

in good health, was born in Florida on March 9, 1966. His parents divorced eleven years later. At age twelve, he was adjudged unruly by a juvenile court. The juvenile court committed him at seventeen to the Department of Youth Services for aggravated robbery and carrying a concealed weapon. At nineteen, he was sentenced to a reformatory for possession of criminal tools, gross sexual imposition, and attempted grand theft of a motor vehicle. Pending charges, noted earlier, involved forgery and receiving stolen property. Jackson denied use of drugs or excessive alcohol. When arrested in September 1987, he worked in a restaurant.

We find the evidence fully supports the single aggravating circumstance that Jackson, as a principal offender or with prior calculation and design, purposefully killed Zak during an aggravated robbery. In contrast with the proved aggravating circumstance, the trial court and court of appeals found no mitigating factors.

After independently assessing the evidence, the only evident mitigating factor is Jackson's age of twenty-one at the time of the offense. We find nothing in the nature and circumstances of the offense to be mitigating. Zak suffered being beaten to death, with multiple fractures, and then Jackson ignominiously stuffed her head into a toilet. Jackson's history, character, and background offer nothing in mitigation aside from his age. Carla Elliott's testimony was of little value. Jackson chose to tell the jury very little about himself; and what we know from the presentence investigation does not suggest extenuation.

Under R.C. § 2929.04(B), the statutory mitigating factors offer little assistance to Jackson. No evidence shows Zak induced the offense, R.C.

§ 2929.04(B)(1), or that Jackson acted under "duress, coercion, or strong provocation," R.C. § 2929.04(B)(2). The psychiatric report failed to suggest any mental disease or defect, R.C. § 2929.04(B)(3). The specified factor, "youth of the offender," R.C. § 2929.04(B)(4), applies and we give it some weight. Jackson's prior record, reflected in the presentence investigation, negates applying R.C. § 2929.04(B)(5). Jackson did say on September 7, in talking with Police Captain Newkirk, that someone else involved in the robbery killed Zak. However, our view of the evidence negates applying R.C. § 2929.04(B)(6). At trial, Jackson and his counsel relied on residual doubt as their principal mitigating factor. Although residual doubt does qualify as a significant "other factor," we choose to give it no weight under the circumstances of this case. See R.C. § 2929.04(B)(7); State v. Apanovitch, 33 Ohio St.3d 19, 29, 514 N.E.2d 394, 405 (1987) (H. Brown, J., separate opinion).

We conclude, after independently weighing the proved aggravating circumstance against mitigating factors, that the aggravating circumstance outweighs mitigation beyond a reasonable doubt. Further, we conclude that death is an appropriate and proportionate penalty when this case is compared with other robbery-murder cases. See State v. Lott, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990); State v. Jamison, supra; State v. Van Hook, supra; State v. Greer, supra.

565 N.E.2d at 562–63.

The Ohio Supreme Court's conclusion that the aggravating circumstance outweighed the mitigation evidence is a factual determination. It cannot be overturned unless the Ohio Supreme Court's decision

on this claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2). The record does not support such a finding by this Court. Consequently, Ground 30 is denied.

**Ground 31. THE PETITIONER'S CONVICTIONS AND SENTENCES ARE VOID AND CONSTITUTIONALLY VOID AND VOIDABLE BECAUSE THEY WERE INSUFFICIENT TO SUSTAIN A CONVICTION OF AGGRAVATED ROBBERY AND THE CORRESPONDING CAPITAL MURDER SPECIFICATION, THUS VIOLATING THE PETITIONER'S RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

In this ground for relief, the Petitioner challenges the guilt determinations made by the jury and the State courts which subsequently reviewed his case with respect to the sufficiency of the evidence supporting the imposition of the death penalty. The Ohio Supreme Court discussed this claim as follows:

Jackson argues that the prosecution did not prove that the murder and robbery were related. He contends that he could have simply taken the register as an afterthought to killing Zak.

However, direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence. *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 10, 5 L.Ed.2d 20 (1960). Intent can be proved from underlying facts and circumstances. *State v. Johnson,* 56 Ohio St.2d 35, 38, 10 O.O.3d 78, 80, 381 N.E.2d 637, 640 (1978). Even murder convictions can rest solely on circumstantial evidence. *State v. Nicely,* 39 Ohio St.3d 147, 150, 529 N.E.2d 1236, 1238 (1988).

From the evidence, the jury concluded that Jackson intended to rob or had robbed Zak when he killed her. Jackson's intent is evident from his pretrial admissions and the physical evidence. Zak's purse and its contents were on the floor. Desk drawers were pulled out, evidencing ransacking. Not only was the register missing, but so were the register keys that had been pinned to Zak's smock. The robbery and murder were clearly related and the prosecution proved the death penalty specification and the robbery charge.

565 N.E.2d at 559.

To the extent that Federal law is actually implicated by this claim, this Court concludes that the Ohio Supreme Court's holding with respect to the sufficiency of the evidence supporting the Petitioner's conviction on aggravated robbery and the corresponding capital murder specification was not "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, Ground 31 is denied.

**Ground 32. THE PETITIONER WAS DEPRIVED OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE OHIO REVISED CODE SECTION 2929.03(D)(1) IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO THE PETITIONER.**

The Petitioner has raised a constitutional challenge to the application of R.C.

§ 2929.03(D)(1) in that there is no provision for a mandatory psychological evaluation and/or social history report. R.C. § 2929.03(D)(1) states

Death may not be imposed as a penalty for aggravated murder if the offender raised the matter of age at trial pursuant to section 2929.023 of the Revised Code and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense. When death may be imposed as a penalty for aggravated murder, the court shall proceed under this division. When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court, pursuant to section 2947.06 of the Revised Code. No statement made or information provided by a defendant in a mental examination or proceeding conducted pursuant to this division shall be disclosed to any person, except as provided in this division, or be used in evidence against the defendant on the issue of guilt in any retrial. A presentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it and any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitiga-

tion of the imposition of the sentence of death, shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender. The defendant shall be given great latitude in the presentation of evidence of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code and of any other factors in mitigation of the imposition of the sentence of death. If the offender chooses to make a statement, the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation.

The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

As this Court previously held in its discussion of Ground 28, an independent psychological evaluation of the Petitioner would not have resulted in the production of mitigation evidence such that the outcome of the penalty phase would have been different. The Petitioner was permitted by the Court to engage the services of a mitigation expert responsible for in-

vestigating the Petitioner's background, family and social history so that mitigating evidence could be gathered. Based on the record, there was little mitigation evidence presented to the jury, and what little evidence there was, was rebutted by the prosecution. Consequently, from a practical standpoint, a mandatory psychological and social history evaluation would not have assisted the Petitioner during the penalty phase, and he was not prejudiced by not having either of them.

 Additionally, the Petitioner has not provided any well-supported legal argument as to why R.C. § 2929.03(D)(1) is unconstitutional. Nonetheless, the Court will briefly discuss the Petitioner's argument. The Petitioner was not compelled to submit to a psychological evaluation or to speak with a pre-sentence investigator. Rather, he voluntarily chose to do so. The Petitioner could have foregone participation in both the psychological evaluation and the pre-sentence investigation if he, and his counsel, decided that more harm than good would have come from them. The Petitioner was afforded a strategic choice whether to submit to a psychological evaluation and pre-sentence investigation, and he and his counsel had to have concluded that the evaluation and investigation would work in his favor during the penalty phase. Under the present statutory scheme in Ohio, a capital defendant is afforded substantial discretion in choosing whether to undergo a psychological evaluation and pre-sentence investigation, and his due process rights are preserved by that discretion. By maintaining a voluntary scheme under which capital defendants may choose to submit to a pre-sentence investigation and psychological evaluation, their due process rights, and strategic control over their defense during the penalty phase of the trial, are preserved. As such, the Petitioner has not

established that R.C. § 2929.03(D)(1) is unconstitutional and is not entitled to habeas relief.

Accordingly, Ground 32 is denied.

**D. Constitutional Defects in the Review of the Petitioner's Sentence**

Ground 33. THE PETITIONER'S DEATH SENTENCE IS UNRELIABLE AND INAPPROPRIATE BECAUSE HE WAS DENIED THE PROCEDURAL SAFEGUARD OF A MEANINGFUL INDEPENDENT PROPORTIONALITY REVIEW OF THE APPROPRIATENESS OF HIS DEATH SENTENCE BY THE TRIAL COURT, THE APPELLATE COURT, AND THE SUPREME COURT OF OHIO, AND WAS FURTHER DENIED A FAIR REVIEW OF HIS DEATH SENTENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The Supreme Court of Ohio conducted proportionality review of the Petitioner's sentence and concluded that "death is an appropriate and proportionate penalty when this case is compared with other robbery-murder cases." *Jackson*, 565 N.E.2d at 563.

 The Petitioner has raised a number of challenges to Ohio's proportionality review scheme and the manner in which proportionality review was carried out in his case. In *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the United States Supreme Court extensively discussed proportionality review in theory,

and in practice. As an initial matter, the Court held that "[t]here is [ ] no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it." *Id.* at 50–51, 104 S.Ct. 871. Rather, "[p]roportionality review [is] an additional safeguard against arbitrarily imposed death sentences. . . ." *Id.* at 50, 104 S.Ct. 871. As such, the Petitioner was not entitled to proportionality review.

Nonetheless, in Ohio, capital defendants are afforded proportionality review as a matter of course pursuant to R.C. § 2929.04(B). The statute provides:

> If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
>
> (1) Whether the victim of the offense induced or facilitated it;
>
> (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
>
> (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;
>
> (4) The youth of the offender;
>
> (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
>
> (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
>
> (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

R.C. § 2929.04(B)(1)-(7).

 Upon reviewing the record, this Court concludes that the Petitioner's claim that proportionality review was not carried out according to the standards set forth in the Revised Code is entirely without merit. Furthermore, the Petitioner has not shown that Ohio's proportionality review scheme is unconstitutional on its face or as applied to him. Therefore, the State courts' adjudication of the Petitioner's proportionality review claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Ground 33 is denied.

**Ground 34. THE IMPOSITION OF THE DEATH SENTENCE IN THIS CASE VIOLATES THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The analysis of the claims set forth by the Petitioner in Grounds 34 and 41 shall be considered together.

**Ground 41. OHIO'S CAPITAL SENTENCING STRUCTURE VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THESE CAPITAL MURDER STATUTES ARE UNCONSTITUTIONAL ON THEIR PHASE AND AS APPLIED TO THE PETITIONER.**

The Petitioner has raised numerous sub-claims in these grounds for relief which much be considered individually by the Court. Where appropriate, similar sub-claims from each of the grounds for relief shall be consolidated.

**a. Paragraph 157. Ohio's statutory capital punishment scheme fails to provide for effective assistance of counsel and an impartial jury. Further, the jury does not have adequate guidelines for deliberating the aggravating and mitigating circumstances. Paragraph 188. There is no specific standard in the process of deciding who is to be sentenced to death and who is not to be.**

 The Petitioner asserts that trial counsel in capital cases cannot effectively represent capital defendants in a bifurcated proceeding during which the jury determines guilt and the penalty. The Supreme Court has held that it is not unconstitutional for the same trier of fact to consider the aggravating circumstances at both the guilt and penalty phases of a capital trial. *See Jurek v. Texas,* 428 U.S. 262, 271, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Supreme Court of Ohio has reached the same conclusion. *See State v. Jenkins,* 15 Ohio St.3d 164, 174, 473 N.E.2d 264 (1984).

Furthermore, the Petitioner contends that there are no standards for the jury to weigh aggravating and mitigating circumstances. In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court held that a statutory scheme with the same weighing standard as that of the Ohio capital sentencing statute passed constitutional muster. *See id.* at 247–50, 96 S.Ct. 2960. In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court stated that Georgia's sentencing scheme was constitutional "even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." *Id.* at 875, 103 S.Ct. 2733. In *Franklin v. Lynaugh, supra,* the Court stated that it has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." 487 U.S. at 172–73, 108 S.Ct. 2320.

Based on the foregoing Supreme Court precedents, the Petitioner does not establish a constitutional violation in Paragraph 157. As such, he is not entitled to habeas relief, and the sub-claim contained in Paragraph 157 is denied.

**b. Paragraph 158. R.C. §§ 2929.02(2), 2929.03, and 2929.04 place an unconstitutional burden on the Defendant's right to a jury trial.**

The Petitioner does not explain his sub-claim, or provide any legal argument in support of it. In reviewing the Response, the Court agrees that this sub-claim is a challenge to the bifurcated jury trial utilized in Ohio capital cases. The Court has discussed this issue in the preceding sub-claim. Therefore, the Court holds that the sub-claim contained in Paragraph 158 is denied.

c. **Paragraphs 159. The appellate review provisions of R.C. § 2929.05 fail to specifically require inquiry and findings regarding arbitrariness, passion or prejudice. Paragraph 186. Ohio's statutory capital punishment scheme allows for imposition of the death penalty in an arbitrary and discriminatory manner. Paragraph 191. Imposition of death creates a substantial risk of arbitrary and capricious application.**

Ohio courts already review capital cases for arbitrariness, passion, or prejudice. *See State v. Durr,* 58 Ohio St.3d 86, 97, 568 N.E.2d 674 (1991). The Ohio Supreme Court did so during the Petitioner's direct appeal. *Jackson,* 565 N.E.2d at 562–63. Therefore, the Petitioner's claims are without basis. Accordingly, the sub-claims contained in Paragraphs 159, 186, and 191 are denied.

d. **Paragraph 160. Ohio's statutory capital punishment scheme impermissively mandates imposition of the death penalty, precludes mercy options, and permits the imposition of the death penalty on a less than adequate showing of culpability.**

■ The Supreme Court has specifically rejected this argument. In *Boyde v. California,* 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the Court held that there is no constitutional basis for the suggestion that a capital jury must have unfettered discretion to decline to impose the death penalty, even if it decides that the aggravating circumstances "outweigh" the mitigating factors. Moreover, the Supreme Court has never held that a specific method for balancing mitigating factors and aggravating circumstances in a capital sentencing proceeding is constitutionally required. *See Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155. There is no constitutional requirement of "unfettered sentencing dis-

cretion in a [capital case] jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Boyde,* 494 U.S. at 377, 110 S.Ct. 1190 (*quoting Franklin,* 487 U.S. at 181, 108 S.Ct. 2320); *see also Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The Supreme Court of Ohio has held that Ohio's capital sentencing statute gives capital defendants great latitude in the presentation of any relevant mitigating factors. *See State v. Jenkins,* 15 Ohio St.3d at 189, 473 N.E.2d 264.

■ For the reasons set forth above, as well as those detailed in the Response, the Court holds that Ohio's capital sentencing scheme comports with the individualized sentencing doctrine mandated by the aforesaid Supreme Court precedents, and therefore denies the sub-claim contained in Paragraph 160. (*See* Response 79–81.)

e. **Paragraph 161. The Petitioner's conviction and death sentence were secured in violation of the Eighth and Fourteenth Amendments denying him his right to due process and protection from imposition of cruel and unusual punishment.**

The Court has dealt with all of the Petitioner's substantive claims at length. Consequently, there is no need to address this vague and unsupported claim here. The subclaim contained in Paragraph 161 is denied.

f. **Paragraph 187. Ohio's statutory capital punishment scheme is cruel and unusual punishment and violates the United States Constitution.**

■ In *Gregg v. Georgia,* 428 U.S. 153, 179, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court rejected the argument

that the death penalty is cruel and unusual punishment. Therefore, to the extent that the Petitioner argues that Ohio's capital sentence scheme is unconstitutional because the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment, the Court denies the sub-claim contained in Paragraph 187.

**g. Paragraph 189. There is no legitimate compelling state interest in the taking of life.**

The Petitioner has not offered any legal argument or analysis in support of this sub-claim. By enacting a statutory capital punishment scheme, the State of Ohio has unequivocally stated that it has a compelling interest in imposing the death penalty. So long as Ohio's scheme does not violate the Constitution, this Court cannot override Ohio's legislature. Therefore, the sub-claim contained in Paragraph 189 is denied.

**h. Paragraph 190. The death penalty is neither the least restrictive nor an effective means of deterrence.**

The Supreme Court in *Gregg* considered the argument that the death penalty is not the least severe penalty which can appropriately effectuate the societal interests of deterrence and retribution. *See* 428 U.S. at 175, 96 S.Ct. 2909. The Court concluded that the death penalty does serve the purposes of deterrence and retribution and that the penalty is not "invariably disproportionate to the crime" of murder. *Id.* at 183–87, 96 S.Ct. 2909. *See also Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

On the authority of *Gregg* and *Tison*, the Court rejects the Petitioner's argument that the death penalty is not the least restrictive means to fulfill the societal interests of deterrence and retribution, and the Court denies the sub-claim contained in Paragraph 190.

**i. Paragraph 192. R.C. § 2929.03(D)(1) is unconstitutional because it requires that a presentence report be submitted to the sentencer once it is requested by the defendant even if the report contains prejudicial material that would not otherwise be relevant or admissible at the penalty phase of the capital trial.**

The Court has considered this argument in Ground 25, *supra.* Accordingly, the Court denies the Petitioner's sub-claim contained in Paragraph 192 for the reasons stated in Ground 25.

**j. Paragraph 193. Ohio's statutory capital punishment scheme is unconstitutionally vague.**

The Petitioner offers no further explanation of this claim. Without more, the Court cannot conclude, after an extensive review of Ohio's statutory capital punishment scheme, that it is unconstitutionally vague. Accordingly, the sub-claim contained in Paragraph 193 is denied.

**k. The standard of proof in the mitigation phase is unconstitutional.**

 The Supreme Court has rejected this claim in *Walton v. Arizona*, 497 U.S. at 650–51, 110 S.Ct. 3047. Thus, to the extent that the Petitioner argues that the Ohio capital sentencing scheme is unconstitutional because it places the burden of proving mitigation by a preponderance of the evidence on the defendant, the Court overrules the sub-claim contained in Paragraph 194.

For the foregoing reasons, the Court concludes that when the Ohio Supreme Court found that the Ohio capital sentencing scheme was constitutional, it did not reach a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, the Court denies Grounds 34 and 41 in their entirety.

**Ground 35. THE PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE STATE OF OHIO, ON APPEAL, FAILED TO ESTABLISH BEYOND A REASONABLE DOUBT THAT ANY CONSTITUTIONAL ERROR WHICH OCCURRED DURING THE PETITIONER'S TRIAL DID NOT CONTRIBUTE TO THE CONVICTIONS AND SENTENCES OF THE PETITIONER.**

Although the Petitioner is correct that, on appeal, " 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt,' " the Court has not found, and the Petitioner has not cited, any evidence which suggests that the State courts did not properly apply this standard in evaluating his claims. *See State v. Brown*, 65 Ohio St.3d 483, 605 N.E.2d 46, 51 (1992) (*citing Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Consequently, the Petitioner's claim in Ground 35 is denied.

**Ground 36. THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE WAS INAPPROPRIATE AND THUS VIOLATED THE FIFTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE RESIDUAL DOUBT EXISTED AS TO THE PETITIONER'S GUILT.**

The Petitioner, in this ground for relief, makes factual assertions which he believes indicate residual doubt as to his guilt. The jury determined that the State proved its case against the Petitioner beyond a reasonable doubt when they found him guilty, and the record is replete with evidence which supports their conclusion. The Petitioner has not established any constitutional violation with respect to the jury's determination. Consequently, this Court cannot impose its own judgment and overturn the jury's verdict.

Therefore, the Petitioner's claims set forth in Ground 36 are denied.

**Ground 37. THE PETITIONER'S EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BY THE MANDATORY NATURE OF OHIO'S CAPITAL STATUTE.**

The Supreme Court specifically rejected this argument in *Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). In *Boyde*, the Court held that there is no constitutional basis for the suggestion that a capital jury must have unfettered discretion to decline to impose the death penalty, even if it decides that the aggravating circumstances "outweigh" the mitigating factors. Moreover, the Supreme Court has never held that a specific method for balancing mitigating factors and aggravating circumstances in a capital sentencing proceeding is constitutionally required. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155. "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' " *Boyde*, 494 U.S. at 377, 110 S.Ct. 1190 (*quoting Franklin*, 487 U.S. at 181,

108 S.Ct. 2320); *also see Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The Supreme Court of Ohio has held that Ohio's capital sentencing statute gives capital defendants great latitude in the presentation of any relevant mitigating factors. *See State v. Jenkins*, 15 Ohio St.3d 164, 189, 473 N.E.2d 264 (1984), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985).

The Court holds that Ohio's capital sentencing scheme comports with the individualized sentencing doctrine mandated by the aforesaid Supreme Court precedents, and therefore denies Ground 37.

**Ground 38. OHIO'S CAPITAL STATUTORY MURDER SCHEME FAILS TO NARROW THE CLASS OF PERSONS CONVICTED OF MURDER WHO ARE ELIGIBLE FOR THE DEATH PENALTY AND THUS, THE PETITIONER'S EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED.**

This issue has already been discussed by the Court, *supra*, in Ground 14 Therefore, Ground 38 is denied.

**Ground 39. THE PETITIONER'S DEATH SENTENCE IS UNRELIABLE AND INAPPROPRIATE AND VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Court has already considered and denied each of the sub-claims raised in this Ground. Accordingly, Ground 39 is denied.

**Ground 40. CONSIDERATION BY THE JURY OF NON–STATUTORY AGGRAVATING CIRCUMSTANCES AT THE PENALTY PHASE VIOLATED THE PETITIONER'S RIGHTS TO DUE PROCESS AND A FAIR AND RELIABLE DETERMINATION OF HIS DEATH SENTENCE.**

The claims set forth by the Petitioner in Paragraphs 183 through 185 have been discussed by the Court, *supra*, and have been denied.

Accordingly, the Petitioner's claims contained in Ground 40 are denied.

**E. Post–Conviction and *Murnahan* Review of the Petitioner's Conviction**

The Respondent has raised a question as to whether the claims raised in Grounds 42 through 48 are cognizable on Federal habeas review. The challenged Grounds are as follows:

**Ground 42. THE FAILURE OF THE CUYAHOGA COUNTY CLERK OF COURTS TO EFFECT SERVICE UPON THE PETITIONER WITH THE TRIAL COURT'S ENTRY DENYING HIS PETITIONER FOR POST–CONVICTION RELIEF AND MOTIONS FOR RELIEF FROM ORDER DEPRIVED THE PETITIONER OF HIS DUE PROCESS RIGHTS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Ground 43. THE TRIAL COURT CANNOT SUMMARILY DISMISS A POST–CONVICTION PETITION WITHOUT AFFORDING THE PETITIONER AN OPPORTUNITY TO CONDUCT DISCOVERY OF FACTS AND EVIDENCE NECESSARY TO JUSTIFY HIS OPPOSITION TO SUMMARY DISMISSAL OR TO DEVELOP AND SUPPORT HIS CLAIMS AFTER STATE CONDUCT BECOMES APPARENT AND SUCH CONDUCT DENIES THE PETITIONER HIS RIGHTS TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Ground 44. THE TRIAL COURT CANNOT DISMISS A POST–CONVICTION PETITION WITHOUT POSSESSING AND REVIEWING THE ENTIRE FILE AND RECORD OF THE PROCEEDINGS INVOLVING THE PETITIONER.

Ground 45. FUNDAMENTAL FAIRNESS REQUIRES THAT THE TRIAL COURT PERMIT THE PETITIONER TO SUBMIT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BEFORE ADOPTING THE STATE'S PROPOSAL AND THE ADOPTION OF THE SAME RESULTS. FAILURE TO DO SO IS A VIOLATION OF THE PETITIONER'S RIGHTS TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

Ground 46. A TRIAL COURT CANNOT GRANT A MOTION TO DISMISS WITH RESPECT TO ANY CLAIM FOR RELIEF IN A POST–CONVICTION PETITION THAT SETS FORTH A SUBSTANTIAL CONSTITUTIONAL VIOLATION AND IF THE TRIAL COURT DOES SO, THE PETITIONER'S RIGHT TO DUE PROCESS AS GUARANTEED UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION ARE VIOLATED.

Ground 47. THE DOCTRINE OF RES JUDICATA CANNOT PROPERLY BE RAISED IN A MOTION OF DISMISS IN A STATE POST–CONVICTION PROCEEDING. TO GRANT DISMISSAL BASED ON RES JUDICATA VIOLATES THE PETITIONER'S RIGHTS TO DUE PROCESS AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Ground 48. THE PETITIONER'S RIGHT TO DUE PROCESS OF LAW AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AND HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION WERE VIOLATED BECAUSE THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS POST–TRIAL APPEALS AND THE PE-

TITIONER WAS DENIED AN EFFEC-
TIVE APPELLATE REVIEW OF HIS
CONVICTION.

In these grounds for relief, the Petitioner has asserted that the State courts' collateral review of his conviction and sentence was constitutionally flawed and seeks relief therefor. The Sixth Circuit in *Kirby v. Dutton*, 794 F.2d 245 (1986) held that relief may not be granted to a habeas petitioner for alleged deficiencies in the State's post-conviction procedures. *See id.* at 248. The Sixth Circuit explained that "[t]he writ, traditionally, has been available when the petitioner is in custody or threatened with custody and the detention is related to a claimed constitutional violation." *Id.* at 246. Therefore, "the writ is not the proper means by which prisoners should challenge the claims, errors or deficiencies in the state post-conviction proceedings ... because the claims address the underlying state conviction giving rise to the prisoner's incarceration." *Id.* at 247 (*citing* cases). In *Kirby*, the petitioner did not raise any claims which derived from his conviction or sentence, but rather only raised claims pertaining to the State's post-conviction proceedings. 794 F.2d at 247. Similarly, in Grounds 42 through 48, the Petitioner attacks the State's post-conviction proceedings and does not raise any claims which pertain to his underlying conviction and sentence. The Sixth Circuit has made clear that " '[e]ven where there may be some error in state post-conviction proceedings, this would not entitle [a petitioner] to federal habeas corpus relief since [the petitioner's] claim ... represents an attack on a proceeding collateral to detention of [the petitioner] and not on the detention itself." ' *Id.* at 247 *quoting Williams v. Missouri*, 640 F.2d 140, 144 (8th Cir.), *cert. denied*, 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed.2d 849 (1981). Accordingly, based upon the foregoing Sixth Circuit precedent, even if the Petitioner can demonstrate that some error occurred during the State post-conviction proceedings, the claims asserted in Grounds 42–48 are not cognizable on Federal habeas review and, therefore, are denied.

## V. CONCLUSION

For the foregoing reasons, the Petition of Andre Jackson Under 28 U.S.C. § 2254 For A Writ Of Habeas Corpus For A Person In State Custody (Dkt.# 14) is hereby **DENIED**. Accordingly, this action is hereby **DISMISSED**.

**Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c); Fed. R.App. P. 22(b).**

**IT IS SO ORDERED.**